218 F.2d 104
 50 A.L.R.2d 216
 Laurence C. SMITH and Laura C. Smith, Co-partners Trading as
Laurence C. Smith Co., Appellant,
v.
ONYX OIL AND CHEMICAL COMPANY, a Corporation of the State of
Delaware (two cases).
 Nos. 11362, 11363.
 United States Court of Appeals, Third Circuit.
 Argued Nov. 18, 1954.
Decided Jan. 3, 1955.
 
 Stephen E. Hamilton, Jr., and Arthur G. Logan, Wilmington, Del., for Smith and another.
 Januar D. Bove, Jr., Wilmington, Del. (Arthur G. Connolly, Connolly, Cooch & Bove, Wilmington, Del., on the brief), for Onyx Oil & Chemical Co.
 Before GOODRICH, STALEY and HASTIE, Circuit Judges.
 GOODRICH, Circuit Judge.
 
 
 1
 These are appeals from a judgment for the plaintiff in a suit for breach of contract. The action was tried to the court without a jury. Both sides have appealed; the plaintiff because he says he did not get damages enough, the defendant because it says that plaintiff should not have any damages at all.
 
 
 2
 The subject matter of the contract, if there was a contract, is an agreement whereby the plaintiff, Smith,[1] entered into an arrangement to sell a chemical product for use as a sizing in the wet washing of fabrics.
 
 
 3
 The defendant is a Delaware corporation, plaintiffs are New Yorkers. The suit in the District Court for the District of Delaware is based on diversity only. The court takes its rules of reference as laid down by the courts of Delaware. Klaxon Co. v. Stentor Electric Mfg. Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477. The Delaware rule with regard to the formation and validity of an agreement purporting to be a contract is determined by the law of the place of contracting. Harris v. New York Life Ins. Co., 1943, 27 Del.Ch. 170, 177-178, 33 A.2d 154, 157-158; Wilmington Trust Co. v. Mutual Life Ins. Co., 3 Cir., 1949, 177 F.2d 404, 406; Kane v. Chrysler Corp., D.C.D.Del.1948, 80 F.Supp. 360, 364. The defendant corporation has its principal place of business in New Jersey and some of the negotiations between the parties took place there. Plaintiff Smith does business in Syracuse, New York, and the defendant's lawyer, Tully, has his office in New York. The reference therefore will be to New Jersey or New York law as the facts discussed below indicate.
 
 
 4
 The defendant has, in the parlance of the criminal courts, thrown the book at the plaintiff in an effort to establish a defense to his claim. We agree with the district judge that none of the alleged defenses are valid. And since the case was discussed with great thoroughness in an opinion by Judge Leahy our discussion of the facts will not need to be nearly so elaborate as it would have had to be if he had not stated them so fully. See Smith v. Onyx Oil & Chemical Co., D.C.D.Del.1954, 120 F.Supp. 674.
 
 I.
 
 5
 Was there a contract? This is the first challenge which defendant offers the plaintiff. The first contact between Onyx and Smith was made by Onyx through one Trezise, a salesman, and one Jacobs, a technical representative, both employed by Onyx, at the suggestion of one Harris, who was in the dry cleaning and chemical business in Cortland, New York. Following this call on Smith, demonstrations were arranged for early in September, 1949, in which the parties were to try out the efficiency of this sizing mixture. Following these demonstrations Jacobs, the technical man for Onyx, worked on the problem of combining the ingredients of this mixture into one marketable product. Smith thought up a name for the combined product which he christened 'Revitex.' In October there was another demonstration following which it was thought that the technical problems had been met satisfactorily. On November 19, 1949, Smith wrote to Onyx and suggested a written agreement giving him exclusive distribution rights. A meeting at the Onyx office in Jersey City on December 12th was arranged. A phalanx of Onyx representatives were present at this meeting to which Smith and his lawyer, Mr. Barnes, brought a proposed draft of a contract. The president of Onyx left before the meeting was over but stated that, in the language of the district court, 'Tully would take things in hand and whatever Smith agreed upon with Tully would be perfectly acceptable to Onyx.' 120 F.Supp. at page 677. Mr. Tully is a New York lawyer and counsel for Onyx.
 
 
 6
 We do not think that it can really be said that a contract resulted from this December meeting in Jersey City. The parties reached agreement on many points, as the district court says, but it is quite clear to us that they had a re-draft of the original paper in mind and other points still to be discussed.
 
 
 7
 Further negotiations continued. Mr. Tully mailed a second draft to Mr. Barnes, Smith's lawyer, on December 16th. On December 20th, Mr. Barnes sent back to Mr. Tully a third draft. And on December 28th, Mr. Tully wrote to Mr. Barnes suggesting some minor changes. On January 9th, 1950, Mr. Barnes sent back to Mr. Tully a letter confirming the changes made and requesting an additional item to be covered. There were other intermediate letters not necessary to outline. Then on January 18th, 1950, Mr. Tully, who had prepared the fourth draft, snet it to Mr. Barnes for Smith's signature. Smith signed this draft in the Barnes office on January 21st. The letter which sent this copy of the agreement to the Barnes office had advised Mr. Barnes, by Mr. Tully, that after Smith had signed the contract Onyx would send back a signed contract for Smith's files.
 
 
 8
 Onyx never did sign. Its excuse was that it had received a letter from a lawyer for the Harris mentioned earlier in this narration, making claims for a portion of Smith's earnings for selling Revitex and threatening Onyx with a law suit if Harris was not paid. There seems to be no doubt that if a contract was made between the parties Onyx repudiated it. Whether that repudiation was excused will be considered later.
 
 
 9
 Was there a contract? On this subject there are two rules which can be stated without the slightest disagreement by anyone. If the parties intend not to be bound until a written memorial is executed by each, then they are not bound until that event takes place. On the other hand, although parties may intend to put their agreement in writing, it does not follow that they have not made a contract until the writing is completed and signed. These two rules are set out in Williston on Contracts, § 28 (Rev. ed., 1936), and in Corbin on Contracts, § 30 (1950). The emphasis of these two eminent writers is, it seems to us, inclined toward finding the formation of a contract prior to the signing of the document unless the parties pretty clearly show that such signing is a condition precedent to legal obligation. And since contract law has passed the formalism of elaborate doctrines pertaining to sealed instruments, it seems to us such emphasis is quite natural and quite correct. It is furthermore emphasized by some rather strong language in the New York cases. Sanders v. Pottlitzer Bros.' Fruit Co., 1894, 144 N.Y. 209, 39 N.E. 75, 29 L.R.A. 431; Disken v. Herter, 73 App.Div. 453, 77 N.Y.S. 300 (1st Dept.1902), affirmed without opinion, 1903, 175 N.Y. 480, 67 N.E. 1081; Boysen v. Van Dorn Ironworks Co., 94 App.Div. 95, 87 N.Y.S. 995 (4th Dept. 1904); Eisenberg v. Spachmann, 117 Misc. 109, 190 N.Y.S. 662 (Sup.Ct.1921); Habib v. Caputo, 168 Misc. 202, 5 N.Y.S.2d 382 (N.Y.Munic.Ct.1938); Schwartz v. Greenberg, 279 App.Div. 750, 108 N.Y.S.2d 421 (2d Dept.1951).
 
 
 10
 As the text writers point out, the question here is one of intention of the contracting parties. Corbin is especially clear on this. He says:
 
 
 11
 'The courts are quite agreed upon general principles. The parties have power to contract as they please. They can bind themselves orally or by informal letters or telegrams if they like. On the other hand, they can maintain complete immunity from all obligation, even though they have expressed agreement orally or informally upon every detail of a complex transaction. The matter is merely one of expressed intention. If their expressions convince the court that they intended to be bound without a formal document, their contract is consummated, and the expected formal document will be nothing more than a memorial of that contract.' Corbin on Contracts, § 30 (1950).
 
 
 12
 Although he does not make an express finding on this matter of intention the district judge does discuss it in coming to the conclusion that the parties did complete a contract. He must necessarily have found that they intended to be bound prior to the time when both parties had signed the agreement and the intention of the parties is, of course, a fact[2] and the finding of fact by the district court is one to be accepted unless clearly erroneous. Fed.Rules Civ.Proc. rule 52(a), 28 U.S.C.
 
 
 13
 Regardless of Rule 52(a), however, the conclusion that a contract was formed by the parties is inevitable. Their minds had met on all points by the time Mr. Tully's last letter was sent to Smith enclosing the draft which Smith signed. The contract was a New York contract and became effective not later than the time when Smith signed the document on January 21, 1950. Whether the agreement became effective prior to that time we do not need to decide. There was a contract between the parties and the defendant broke it.
 
 II.
 
 14
 Has the applicable statute of frauds been complied with? The defendant says no. The district court handled this matter so completely that it is not necessary to enlarge upon it here. He pointed out that whether the New York statute or the New Jersey statute is applicable, the agreement here violates neither one. As indicated above, we think the New York statute is the one to be looked to. Delaware, as the district judge points out, regards the statute of frauds as a substantive matter and, therefore, the law of the place of contracting must be complied with. New York, as we have already said, is the place of contracting.
 
 
 15
 It is worth emphasizing, however, that both New York and New Jersey statutes have an exception to their requirement for a writing where the subject matter of the contract is to be 'manufactured by the seller especially for the buyer and (is) not suitable for sale to others in the ordinary course of the seller's business.' N.Y.Personal Prop.Law, McK.Consol.Laws, c. 41, § 85; N.J.Stat.Ann. § 46:30-10(2) (1940). The subject matter of this contract was given the coined name, Revitex. The formula was worked out from well-known ingredients but after some considerable experimentation by technical people. There is no doubt that it comes within the exception of the statutes.
 
 
 16
 What has been said does not indicate that the district judge is not right on the other point mentioned, namely, that the memorandum may consist of several writings, only one of which need be signed. Restatement, Contracts, § 208; Marks v. Cowdin, 1919, 226 N.Y. 138, 123 N.E. 139; Buckley v. Mayor, etc., of Jersey City, 105 N.J.Eq. 470, 148 A. 630 (Ch.), affirmed 107 N.J.Eq. 137, 151 A. 905 (E. & A. 1930). We agree with the district court that the letters from Mr. Tully and Mr. Brick, vice president of Onyx, which both refer to the written contract mailed to Mr. Barnes on January 18, 1950, are sufficient to satisfy this rule.
 
 
 17
 There was no failure to comply with the statute of frauds.
 
 III.
 
 18
 The defendant asserts in this Court that the alleged agreement is in violation of the anti-trust laws. The district court opinion indicates that while the case was there the defendant had ceased to emphasize this portion of its defense. Whether it did or not does not matter. We think the defense as raised in this case is so flimsy as to be almost frivolous. All Onyx purported to do was to sell a product of its manufacture with a coined name to persons whom Smith induced to buy it and to pay him compensation therefor. Onyx could have set up a subsidiary organization to act as a sales agency. Had it done so there certainly would have been no violation of any law. Here it was going to do the same thing through Smith. We do not think the argument worth prolonging. This is no anti-trust case. Brosious v. Pepsi-Cola Co., 3 Cir., 1946, 155 F.2d 99. See also Comment, Refusals to Sell and Public Control of Competition, 58 Yale L.J. 1121, 1129 et seq. (1949).
 
 IV.
 
 19
 Alleged fraudulent concealment by Smith. Defendant now says that Smith was fraudulent because he did not tell Onyx about an alleged agreement made with Harris to pay Harris a portion of what he (Smith) was to receive through the sales of Revitex. This is a weak argument. In the first place the presence of Harris as a character in this drama was known to the Onyx people from the very beginning. It was Harris who got Onyx in touch with Smith. It was at the Harris plant in Cortland that the first tests were made. The record clearly shows that Harris' presence in the background throughout the entire period of negotiation was known by all parties concerned. Even though his sudden appearance in the foreground may have been unexpected, it was not legal justification for Onyx to repudiate its contract. In the second place, and this we think conclusive, if there was an arrangement between Harris and Smith to divide what Smith made in selling Revitex that is no concern of Onyx. If the lawyer for Harris made claims on Onyx that were groundless the fact that they were made is no excuse for Onyx to repudiate a contract. Harris and Smith could make whatever arrangements they pleased. What they did was nothing with which Onyx needed to be concerned.
 
 V.
 
 20
 Damages. Plaintiff claimed damages upwards of $100,000 for the breach of this contract and has appealed because the district judge only gave him $25,000. The defendant, on the other hand, claims that Smith has shown no damages at all and his claims of loss are wholly speculative and conjectural. The measure of recovery in a case involving profits from an undeveloped product was discussed by this Court in Stentor Electric Mfg. Co. v. Klaxon Co., 3 Cir., 1940, 115 F.2d 268. The subsequent appeal of that case to the Supreme Court and its remand back to this Court is irrelevant on this question of damages. 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477. It was pointed out that damages in such a case as this cannot be determined with mathematical certainty and that a defendant who has broken a contract should not be allowed to profit by his breach because of the difficulty in fixing damages with exactness.
 
 
 21
 The district court applied the criterion there specified to the ascertainment of damages to be awarded the plaintiff in this case.
 
 
 22
 We agree with his conclusion but believe that the reasons to support it must be developed a little more fully. The first question involves the rule of reference to be made to determine what law governs the answer to the question. It is the better view and the majority view that the measure of damages for breach of contract is to be determined by the law of the place of performance. The theory is that such damages are the substitute given for the injured party's right to performance and this substitute is not a mere procedural matter referable to the law of the forum. Restatement, Conflict of Laws, §§ 372, 413. The Delaware law is in accordance with this view. See the discussion of the Delaware law and the decisions cited in Stentor Electric Mfg. Co. v. Klaxon Co., on remand, 3 Cir., 1942, 125 F.2d 820, 822.
 
 
 23
 What is the place of performance in this case? Onyx agreed to deliver at its own expense the Revitex sold by Smith to customers within an area described as follows:[3]
 
 
 24
 '* * * starts at Atlantic City runs in a north westerly direction through Philadelphia to Scranton and thence to Buffalo; through Buffalo in an easterly direction through Syracuse, Albany and to Boston. Shipments to all the towns mentioned are included in the prepaid zone.'
 
 
 25
 For points outside this area Smith was to pay the freight and we take it that performance by Onyx in such cases was completed when it made shipment from its Jersey City plant. So here is a case where we have part performance in New Jersey called for and part performance in surrounding states within the area described.
 
 
 26
 What shall the rule of reference be in such a case? It could be that the question is to 'be chopped up into as many pieces as there are places for performance.' Goodrich, Conflict of Laws, 325 and note 65 (1949). But the courts, in cases where performance is called for in different states, show a strong tendency to refer the question to the law of the place of contracting. Thus, in Morgan v. New Orleans, M. & T.R. Co., C.C.La., 1876, 17 Fed.Cas. pages 754, 758, No. 9,804, Circuit Justice Bradley, when faced with this problem, stated: 'In this embarrassment, I do not know that I can do better than to fall back on the general rule that a contract is to be governed by the law of the place where it is made.' See also, Bernstein v. Lipper Mfg. Co., 1932, 307 Pa. 36, 160 A. 770; Oakes v. Chicago Fire Brick Co., 1944, 388 Ill. 474, 58 N.E.2d 460; Goodrich, Conflict of Laws, 325 (1949); 2 Rabel, The Conflict of Laws, 462-472 (1947).
 
 
 27
 We have no Delaware decision precisely upon this point. But the Delaware cases discussed in our opinion in the Stentor case in 125 F.2d 820, supra, indicate pretty clearly that Delaware would be in accord with this general rule of conflict of laws. Our reference, therefore, is to the New York law.
 
 
 28
 When we come to the New York cases we think the result is pretty clear. The damages for the loss of profits can be recovered in such a case as this. Wakeman v. Wheeler & Wilson Mfg. Co., 1886, 101 N.Y. 205, 4 N.E. 264 ('But when it is certain that damages have been caused by a breach of contract, and the only uncertainty is as to their amount, there can rarely be good reason for refusing, on account of such uncertainty, any damages whatever for the breach. * * * It is not true that loss of profits cannot be allowed as damages for a breach of contract * * * so far as they can be properly proved, they may form the measure of damage. As they are prospective, they must, to some extent, be uncertain and problematical; and yet on that account a person complaining of breach of contract is not to be deprived of all remedy.') See also, Spitz v. Lesser, 1951, 302 N.Y. 490, 99 N.E.2d 540; Duane Jones Co. v. Burke, 1954, 306 N.Y. 172, 117 N.E.2d 237; Duro Sportswear v. Cogen, Sup., 1954, 131 N.Y.S.2d 20, 26.
 
 
 29
 We have perhaps labored this point somewhat although it was not referred to by counsel for either side. It is not clear, however, that the New Jersey decisions are in disagreement, even though it should be thought that New Jersey law is the proper reference. There is certainly New Jersey language squarely in accordance with the point of view expressed in New York, Oliver v. Autographic Register Co., 1939, 126 N.J.Eq. 18, 7 A.2d 797; see also Feldman v. Jacob Branfman & Son, 1933, 111 N.J.L. 37, 166 A. 126, but there is also some language which tends to indicate a narrower rule, Cohen v. Wozniak, 1951, 16 N.J.Super. 510, 85 A.2d 9; Adrian v. Rabinowitz, 1936, 116 N.J.L. 586, 186 A. 29; Weiss v. Revenue Building & Loan Ass'n, 1936, 116 N.J.L. 208, 182 A. 891, 104 A.L.R. 129.
 
 
 30
 Concluding, now, that there can be a recovery of Smith's anticipated profits, how much may he have? The plaintiff had as a witness an accountant who, upon making certain assumptions as to how much Smith could sell, drew conclusions about what the profits would be. It is not difficult to shoot these estimates full of holes as the defendant has done. On the other hand, it was found that Smith was an accomplished salesman. There was some experimental selling of the product while negotiations were going on between the parties looking to final contract. The selling experience was successful. Testimony shows great enthusiasm by all the persons concerned about the efficiency of the product for the purpose for which it was prepared. We do not think this is a case where it can be really said that there would have been no profit to Smith had the contract been performed. We think there would have been some profit. As to the amount, we do not see that our estimate can be any better than that of the trial judge and we are satisfied with what he has done with one exception.
 
 
 31
 That exception is that the plaintiff cannot have both profits and expenses. This relates to the item of $3,758.79 which Smith claimed as expenses in getting ready to perform this contract. This, we think, is not recoverable. If he has the profit he was to make, had the contract been performed, he cannot also have the expenses to which he was put to make that profit. That item must, therefore, be deleted from his judgment.
 
 VI.
 
 32
 Interest. Plaintiff claims that he is entitled to interest on his judgment from January 31, 1950. The district court, following our decision in the Stentor case, supra, held that plaintiff was entitled to interest from the date of commencement of the action because there was no fixed and certain date of breach. The court's reason for this conclusion was that Smith still proceeded with his promotional and selling activities until July, 1950. In this we think the learned court erred. The fact that Smith continued in a limited manner to perform his part of the contract does not negative defendant's breach. Restatement, Contracts, § 320; see also New York decisions cited in New York annotation to the Restatement. Nor does it make the date of defendant's breach uncertain. Restatement, Contracts, § 321; see also the cases cited in the New York annotations to this section. Defendant's letter, by Mr. Tully, on January 31, 1950, was a clear repudiation of the contract and suffices to fix the date of the breach.
 
 
 33
 The judgment of the district court will be vacated and the case remanded to the court for the amendment of the judgment to delete the $3,758.79 for expenses and to add interest from January 31, 1950. Each party is to bear his own costs.
 
 
 
 [1]
 Laurence C. and Laura C. Smith, copartners trading as Laurence C. Smith Co
 
 
 [2]
 'The state of a man's mind at a given time is as much a fact as is the state of his digestion.' Swift v. Rounds, 1896, 19 R.I. 527, 531, 35 A. 45, 46, 33 L.R.A. 561
 
 
 [3]
 The contract provided that: 'such prices shall include all freight and delivery charges to Smith or consignees of Smith within the zone outlined on the map hereto attached marked Schedule A and made part hereof.' The map was not attached, but a letter to Mr. Smith from Mr. Jenny, Sales Manager of Onyx, dated December 20, 1949, confirmed this one item and the language in the text is from this letter