**Al LEVINSON and Jack Wertz, t/a The Washington Liquidators, Plaintiffs,**

v.

**The EVENING STAR NEWSPAPER CO., Defendant.**

**Civ. A. No. 1616–53.**

United States District Court
District of Columbia.
Nov. 17, 1955.

948

Hannan & Castiello, Ralph F. Berlow, Washington, D. C., for plaintiff.

Hamilton & Hamilton, Wm. B. Jones, Washington, D. C., for defendant.

McLAUGHLIN, District Judge.

This is an action grounded in breach of contract, it being alleged that the contract was entered into between plaintiffs, trading as The Washington Liquidators, and the defendant, The Evening Star Newspaper Company, by which the defendant contracted and agreed to accept an advertisement tendered by the plaintiffs or its agents; and that the defendant under the agreement undertook to publish four copies of the advertisement on four succeeding Sundays; and that after publication of the first advertisement the defendant failed, neglected and refused to publish any additional advertisements.

The plaintiffs allege that as the result thereof the plaintiffs were caused to suffer damages, and plaintiffs sue for said damages.

The two plaintiffs are engaged in the jewelry business in different parts of this country. They have engaged in the business separately, but in a number of occasions have engaged together in the practice of purchasing stocks of jewelry from various sources, estates, and other sources, including the purchase of stocks of jewelry from companies who sell their stocks of jewelry en masse and cease to do business.

The situation that is outlined in the evidence indicates that the facts are substantially that the two plaintiffs came to the City of Washington after having heard from an outside source that the Heidenheimer stock of jewelry could be purchased en bloc or en masse; that they contacted the Heidenheimer Jewelry Company or the president thereof, and learned that that fact was true; that they then sought to secure from newspapers the right to publish advertisements advertising the sale of the stock; that they called on two newspapers, and they were refused the right; that they then

called on the retail advertising manager of the defendant company, and a conversation took place on the 18th day of August, 1951, at which time the retail advertising manager of defendant, Mr. Aiello, stated at the conclusion of the conversation that he would have to check the matter with the advertising manager, Mr. Godfrey Kauffman, and that he would advise the parties plaintiff the next day.

There is evidence that the next day the retail advertising manager advised the plaintiffs that the advertising would be accepted, and there is a conflict of evidence as to whether the acceptance was conditioned on the approval of the advertising manager or the checking of the advertising by the Better Business Bureau. At any rate it was understood and agreed between the parties that the advertisement would be run.

The plaintiffs then employed an advertising agent, Mr. Heller, and Mr. Heller and his organization prepared the copy and submitted same to the defendant company. The defendant company's agent, Mr. Aiello, agreed that it had been submitted, but that it is customary to submit the second copy, and that no second copy was received. It is agreed, or established by the evidence if not agreed, that the one-page advertisement was run in the paper of the defendant on Sunday, September 16, 1951; and that on September 21, 1951 the advertising agent received a letter thanking him for the business without reference to the contents of the advertising; that on the following Sunday no advertisement appeared in the Washington Star as contemplated by the agreement which plaintiffs contend they made orally.

In the meantime, on September 11, 1951, prior to the publishing of the first advertisement on September 16, 1951, the advertising agent, Paul Lynn Heller, Advertising, Inc., by Paul Lynn Heller, as president, signed what is captioned "Local Advertising Contract" calling for the advertisement to the extent of 5,000 lines of display advertising at the rate of 31½ cents per line, the date of September 16, 1951 being inserted as the beginning date.

In the contract signed by the parties just mentioned the terms are set forth on the reverse side, and there appears as a separate paragraph under the word "Terms" the following: "The right to reject, discontinue or omit any advertisement or parts of advertisements is expressly reserved."

The witness for the defendant, Mr. Aiello, the retail advertising agent, referred to previously in this statement assigned his reasons for not publishing the material after the first issue, and numerous grounds and reasons are set forth, summing up to a position on the part of the defendant newspaper company that the material was objectionable because it was misleading from many standpoints, among which were: That the headline that the Edward Heidenheimer Company was retiring from business was not a fact in that that company had already retired; that there was a representation that the goods were the goods of the Edward Heidenheimer Company, whereas the goods were largely made up of other goods shipped in from other sources, and that that fact was referred to in such a minor way as to constitute the misleading statement; that the pricing of the goods did not conform with the practice of defendant company; that it was misleading because it carried the implication that the Edward Heidenheimer Company was conducting the sale, whereas said company was not conducting the sale; that the word "liquidation" prominently displayed was misleading since it meant a "liquidation sale" of a stock whereas it was in reality a "going out of business sale" which is a different type of sale; and further it was misleading for the reason that there was added to the material which was being sold out of the Heidenheimer stock a very substantial amount of stock from other sources; that the statement in the advertisement "Savings beyond belief" was not true for the reason that many of the items purchased by the plaintiffs from

the Heidenheimer Company were in fact being sold for prices larger or greater than those prices at which the Heidenheimer Company had been customarily selling those items; and lastly, that it was not in fact an "Edward Heidenheimer" sale, but it was in fact what the witness characterized a "Wertz-Levinson sale."

The issues were delineated by the parties at the outset of the case. There is a conflict of evidence on a number of points, such points as whether or not the Better Business Bureau approval was mentioned between the parties, and whether that was the real basis for the cancellation or noncontinuance of the contract, or whether the defendant company ceased to run the ad for the reason that it was harmful to other companies in the City of Washington engaged in the jewelry business. Plaintiffs contend in that respect that the retail advertising agent, Mr. Aiello, so stated on the telephone the morning after the ad failed to be published on the second Sunday, which telephone conversation is denied by the witness Aiello.

The issues, as agreed upon in substance by the parties were as follows:

Was there a contract between plaintiff and defendant entered into prior to August 20, 1951?

Second, was the instrument signed by the signatories on September 11, 1951, a contract?

If it was a contract, was the defendant entitled to cancel it?

And lastly, what would be the damages in the event of a judgment.

■ Now the rule is clear that where there are two contracts involved, one a verbal contract and another a written contract, in the event it is determined that there are two contracts, the written contract being subsequent to the verbal contract, the written contract prevails, and the verbal contract is merged in the written contract.

■ This is clearly stated by the Supreme Court in an early case, that is,

early from our present standpoint, Hawkins v. United States, which is reported in 96 U.S. 689, 24 L.Ed. 607, and the rule is so commonplace that it hardly need be stated, but it is stated in a few words at the very opening of the opinion, and consequently the Court will repeat it:

"Verbal agreements between the parties to a written contract made before or at the time of the execution of the contract are in general inadmissible to vary its terms or to effect its construction, the rule being that all such verbal agreements are to be considered as merged in the written instrument."

That leads us to the question as to whether Plaintiff's Exhibit No. 2, the instrument captioned "Local Advertising Contract" constitutes a contract between the plaintiffs and the defendant; and it is contended by the plaintiffs that it does not for two reasons: First, that Paul Lynn Heller, Advertising, Inc., and Paul Lynn Heller, president, do not represent The Washington Liquidators, and did not represent The Washington Liquidators at the time of the signing of the contract on September 11 in such a way as to bind The Washington Liquidators by the action of said advertising concern, and Second that the contract is not binding in any event upon the plaintiffs for the reason that the contract is not signed by the defendant.

■ Now with respect to the first question, the Court is of the opinion and holds that Paul Lynn Heller, Advertising, Inc., did represent the plaintiffs. The Court concludes and finds that the evidence is sufficient to establish that Paul Lynn Heller, Advertising, Inc., was called upon by the plaintiffs to represent the plaintiffs and that he did represent them.

■ On the second question the Court is of the opinion on the basis of a number of authorities, that the second contract is valid, notwithstanding the fact that it is not signed by the defendant. That is supported in the Court's opinion by a somewhat recent case in the Third Cir-

cuit Court of Appeals which is illustrative of a large number of cases to the same effect, the case being Smith v. Onyx Oil and Chemical Co., 218 F.2d 104, decided January 3rd of this year.

The pertinent excerpt which is illustrative reads as follows at page 108 under caption "Was there a contract?"

"If the parties intend not to be bound until a written memorial is executed by each, then they are not bound until that event takes place. On the other hand, although parties may intend to put their agreement in writing, it does not follow that they have not made a contract until the writing is completed and signed. These two rules are set out in Williston on Contracts, § 28 (Rev. ed., 1936), and in Corbin on Contracts, § 30 (1950). The emphasis of these two eminent writers is, it seems to us, inclined toward finding the formation of a contract prior to the signing of the document unless the parties pretty clearly show that such signing is a condition precedent to legal obligation. And since contract law has passed the formalism of elaborate doctrines pertaining to sealed instruments, it seems to us such emphasis is quite natural and quite correct."

There are other cases on the same subject in the decisions and in the textbooks. For instance, American Jurisprudence 12 at page 552 under the subject "contracts" contains the following:

"The fact that one of the parties has signed the contract does not necessarily require that the other party should do likewise. A written contract, not required to be in writing, is valid if one of the parties signs it and the other acquiesces therein. Acceptance of a contract by assenting to its terms, holding it, and acting upon it may be equivalent to a formal execution by one who did not sign it."

It is worthy of comment, and of some significance that the complaint is grounded upon a contract of September 11, 1951. However, that in the Court's mind is not the controlling point. In fact permission would have been granted plaintiffs to amend the complaint and allege reliance on an oral agreement of August 19, 1951, if plaintiffs had sought such amendments. Plaintiffs may now amend if they so desire.

The controlling point under the circumstances is whether the defendant, a newspaper concern, has the right to cancel this contract. A case was referred to by counsel for the defendant in his argument, which is a very pronounced statement of the rights and responsibilities of a newspaper and its powers to cancel contracts or refuse advertising contracts or to refuse to publish advertisements. That case is the case of Shuck v. Carroll Daily Herald, 215 Iowa 1276, 247 N.W. 813, decided by the Supreme Court of Iowa on April 4, 1933. The headnote clearly states the rule:

"Newspapers being strictly private enterprise, publishers may refuse to publish whatever advertisements they do not desire to publish."

Counsel for the plaintiffs contends that while that may be true, nevertheless if a newspaper company undertakes to publish an advertisement and enters upon the publishing of it under a contract, then the situation differs in that the company is required to continue to publish the remainder of the advertising contracted for.

Now that question was raised quite directly by the Supreme Court of New York in a case decided in 1927 entitled Amalgamated Furniture Factories, Inc., v. Rochester Times-Union, 128 Misc. 673, 219 N.Y.S. 705, 706.

In that case the facts were not identical with the present situation, but they were quite strikingly similar, in that after an advertisement had been begun, the defendant newspaper company ceased to carry the advertising, and the plaintiff contended that the defendant newspaper company had no legal right to

do so. The opinion sets forth the bases for the defendant's action, and states that:

"The defendant claims to be within its rights in its refusal to furnish the remaining contract space to plaintiff, on two grounds: (1) that the privilege of approval of the copy of the advertisement was expressly reserved to it in the contract; and (2) that the advertisements already published were untrue and deceptive, and the copy for those it declined to publish, is of kindred character, even if offensive in a lesser degree."

And the Court states in its opinion at the conclusion:

"The plaintiff, in its moving papers, ascribes motives to the defendant, founded upon conversations alleged to have been had between its manager and representatives of the defendant," such as claimed here; "the latter denied the statements attributed to them. If they acted solely upon the grounds that the plaintiff alleges, it may well be that the refusal to publish the advertisements was unreasonable. On the other hand, if defendant had a legal right to refuse, any other motive, even if malicious, which is not claimed here, is negligible."

It cites a number of cases in support of that proposition.

Applying the foregoing rule to the instant case the Court finds that the refusal of defendant to publish further advertising after the first publication was not unreasonable and the Court concludes as a matter of law, in the circumstances, that it was within the power of the defendant newspaper company legally, to cancel the contract and to refuse further to publish advertising. In the Court's opinion this is equally as true under the oral agreement upon which plaintiffs rely, as under the written contract captioned "Local Advertising Contract" which plaintiffs have introduced in evidence in this litigation.

So the Court finds for the defendant and will call upon counsel for the defendant to prepare findings of fact and conclusions of law and an order, in consonance with the above statement of the Court, and submit same to counsel for the plaintiffs, and thereafter to the Court for execution.