232 F.2d 831
 ROBERT H. FOX CO., a Copartnership, by Robert H. Fix,
Liquidating Partner, and Robert H. Fix and Gladys
E. Fox, Husband and Wife,
v.
KEYSTONE DRILLER COMPANY and California Trust Company,
Keystone Driller Company (now Stardrill-Keystone
Company), Appellant.
KEYSTONE DRILLER COMPANY, a Corporation (now
Stardrill-Keystone Company), Appellant,
v.
ROBERT H. FOX CO., a Partnership, and Robert H. Fox and R.
M. Hollowell, Trading and Doing Business as Robert
H. Fox Co.
 Nos. 11622, 11623.
 United States Court of Appeals Third Circuit.
 Argued Oct. 17, 1955.
Decided April 18, 1956.
 
 Samuel K. McCune, Pittsburgh, Pa. (Krikpatrick, Pomeroy, Lockhart & Johnson, Pittsburgh, Pa., on the brief), for appellant.
 Myron E. Rowley, Ambridge, Pa. (Ralph E. Smith, James E. Rowley, Rowley & Smith, Ambridge, Pa., on the brief), for appellees.
 Before McLAUGHLIN, KALODNER and STALEY, Circuit Judges.
 KALODNER, Circuit Judge.
 
 
 1
 These appeals are taken by Keystone Drilling Co., a corporation ('Keystone'), from adverse judgments entered in two diversity actions consolidated for trial without jury in the district court. Keystone asserts that the district court erred in its findings, made pursuant to Rule 52, Federal Rules of Civil Procedure, 28 U.S.C.A.; as to damages caused by Keystone's breach of contract; as to disallowance of credits claimed, and as to the computation of interest.
 
 
 2
 Keystone and Robert H. Fox Co., a partnership ('Fox Co.'), entered into a contract in September, 1948, for a term of ten years. The contract, among other things, required Fox Co. to design, engineer and sell, and Keystone to manufacture a type of heavy carriage equipped with rubber tires for mounting cranes, power shovels and other heavy equipment. Keystone was to provide the necessary financing, and Fox Co. was to receive from it a commission of 7 1/2 percent of the net contract price contained in the sales contracts approved by Keystone; Keystone was to advance to Fox Co. $1,500 monthly, against commissions; of this, $1,000 was for selling and $500 for engineering. In addition, Fox Co. was to exercise an option (which it held from a third party) for the purchase of so-called 'drive Units' usable in construction of heavy carriages, and Keystone was to advance $16,500, of which $11,500 was for the purchase of the 'Drive Units' and $5,000 was for working capital for Fox Co., on which latter sum Fox Co. was to pay 5 percent interest. Keystone and Fox Co. were to share the profits realized from the use of the Drive Units.
 
 
 3
 The district court found further facts as follows:
 
 
 4
 The parties entered upon performance of the contract.[1] Fox Co. set up an office in Pennsylvania, where Keystone had its office and plant. Fox Co. designed and engineered a pilot model carriage which Keystone commenced to make. The carriages were to sell for approximately $10,000. At least four orders were obtained by Fox Co. and accepted by Keystone. These were not filled by Keystone, nor did it pay the advance commissions to Fox Co. as scheduled or in full. Although Fox Co., through Robert H. Fox, continually sought performance by Keystone, the latter lacked sufficient cash or credit even to complete the pilot model. Finally, in June, 1951, Fox Co. withdrew from the enterprise, and Robert H. Fox found employment elsewhere. Eventually, Keystone disposed of the Drive Units for $2,800.
 
 
 5
 Subsequently, Robert H. Fox, as liquidating partner of Fox Co., and his wife, instituted action[2] against Keystone for breach of contract. Keystone filed a counterclaim based upon Fox Co.'s promissory note for $16,500, and also instituted an independent action[3] against Fox Co. on the note, obtaining judgment by confession. Fox Co. moved to set aside the latter judgment so that it could assert defenses.
 
 
 6
 The district court found that Keystone was in default under the contract. It determined that Fox Co. was entitled to recover net profits as damages for the thirty-two month period ending June 1, 1951, when Fox Co. withdrew, this being the only period for which damages were claimed. Using the agreed advance commissions as a guide, but relying on all the evidence, the district court found that it was within the contemplation of the parties and that Fox Co. would reasonably have sold an average of two carriages per month, or a total of sixty-four carriages in the period involved.
 
 
 7
 The district court further found that Fox Co. was the agent of Keystone in the purchase of the Drive Units. It therefore disallowed the credit claimed by Keystone of $8,700.[4] However, the district court determined that proof by Fox Co. as to profits to be derived from the use of the Drive Units was inadequate to permit an award of damages, and denied Fox Co.'s claim therefor. Finally, the district court held that Keystone was entitled to recover from Fox Co. the $5,000 working capital loan, together with the specified interest.
 
 
 8
 Accordingly, the district court entered a money judgment in favor of Fox Co., and at the same time dismissed Keystone's counterclaim and set aside the judgment by confession which it had obtained. Keystone then prosecuted these appeals.
 
 
 9
 Keystone contends here that Fox Co. did not show with reasonable certainty the number of orders it could have obtained, and that its evidence was inadequate to permit the district court to determine net profits, since there was a failure to show expenses saved by Fox Co. Keystone asserts, further, that orders could have been rejected by it, pursuant to the contract, and that it had valid business reasons for so doing, namely, its financial condition and the physical limitations of its facilities. It contends that the district court erred in failing to take these factors into account in estimating the number of sales on which Fox Co. should be awarded commissions. The district court erred again, according to Keystone, in disallowing as a credit the remaining $8,700 of the $11,500 'loan' for the purchase of the Drive Units, and in the method used by the district court in the calculation of interest.
 
 
 10
 We note, first, that the contract here involved was executed by Keystone in Pennsylvania, and by Fox Co. in California; Fox Co. mailed it back to Keystone. In measuring the damages to which Fox Co. is entitled for breach of the contract, we apply the law of Pennsylvania, for it appears, on the whole, that the contract was to be performed there, where Keystone had its office and plant and Fox Co. established its office and rendered the require services. This is the rule generally. Smith v. Onyx Oil and Chemical Co., 3 Cir., 1955, 218 F.2d 104, 110. And it is the rule of Pennsylvania. Krauss v. Greenbarg, 3 Cir., 1943, 137 F.2d 569, 570. Of course, the conflict of laws rule of Pennsylvania, as the situs of the forum, controls. Klaxon Co. v. Stentor Electric Mfg. Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477. To the extent that the effect of contractual provisions is involved, Pennsylvania, as the situs of the forum, would in this situation apply its own law as the place of performance. York Metal & Alloys Co. v. Cyclops Steel Co., 1924, 280 Pa. 585, 588, 124 A. 752. Keystone agrees that the law of Pennsylvania applies.
 
 
 11
 In the process of review, our touchstone is the settled, yet vital principle, that the findings of the district court prevail unless they are clearly erroneous, that is, unless the record leaves us with the 'definite and firm' conviction that a mistake has been made. United States v. Oregon Medical Society, 1952, 343 U.S. 326, 339, 72 S.Ct. 690, 96 L.Ed. 978; United States v. United States Gypsum Co., 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746.
 
 
 12
 There is no difference between the parties here as to the law of damages, but their dispute concerns its application. The district court had before it a good deal of evidence relating to the market for the product involved, and certainly enough to apprize it of the technical difficulties of the project. The defendant furnished statistics as to the total number of relevant units sold throughout the country. The district court deduced that the contracted for advance of $1,500 per month, the equivalent of commissions on two orders, indicated that it was within the contemplation of the parties that on the average the commissions would at least equal the advances. Therefore, giving consideration to all of the evidence, it concluded that an average of two orders per month would not be an unreasonable determination. See Burks v. Sinclair Refining Co., 3 Cir., 1950, 183 F.2d 239, 242, footnote 1. Such a finding was clearly within the discretion of the fact finder, and we cannot say that it is wrong. As we stated in Agitair Products Corp. v. F. C. Castelli Co., 3 Cir., 1952, 195 F.2d 798, at page 799:
 
 
 13
 'In these cases the rule has long been settled that perfect mathematical certainty is not required. From the breach of contract the court has concluded that the plaintiff has suffered some damage. The measure by which that damage is to be ascertained is agreed upon, as already shown, by all parties. The application of the rule to the testimony was a fact finding job. We are convinced that it was done without error.'
 
 
 14
 See also, Smith v. Onyx Oil and Chemical Co., supra, 218 F.2d at page 110. We think the refusal of the district court to permit keystone's expert to give his opinion as to the number of carriages which Fox Co. might have sold was not erroneous. First, a proper qualifying basis for such testimony was not supplied. Second, the witness furnished the court with evidence upon which it could arrive at its own conclusion. Third, nothing the witness said bore upon, or indicated he had any knowledge of the personality, experience and contacts of Robert H. Fox, the principal in Fox Co., and these had a bearing on the ultimate result reached by the district court.
 
 
 15
 Keystone insists that Fox Co. failed to show the savings of expenses, and consequently failed to furnish an adequate basis upon which its loss of profits could be determined. In this argument, Keystone overlooks the finding of the district court that Fox Co. devoted full time and energy to the enterprise in the thirty-two month period involved, from October 1, 1948, to June 1, 1951. Further, Robert H Fox testified that he travelled and that even after Keystone's conduct was marked chiefly by procrastination and indecision, he continued to advance the interest of the venture. The savings in engineering expenses were shown, and these deducted by the district court. There is, in our opinion, enough in the record to require us to permit the district court's conclusion to stand. A plaintiff in the position of Fox Co. has an especially difficult row to hoe; and a defendant in the position of Keystone can frequently profit by sitting back. But where, as here, there is performance on one side, a case for commissions is made out. It devolved upon Keystone to show that Fox Co. did not incur expenses which would have been incurred had Keystone permitted the undertaking of additional orders. Irrelevant to this situation are the cases relied upon by Keystone wherein the breach of contract patently saved expenses of performance.
 
 
 16
 In the same vein, Keystone advances as a defense its financial condition and the physical limitations of its plant. Its theory is that orders were subject to acceptance, and therefore it had the right of rejection for valid business reasons. The argument appears to be stated in terms of a complete defense as well as in terms of justification for the rejection of some orders; in this latter respect, Keystone maintains that the district court failed to find the number of orders it was entitled to reject.
 
 
 17
 Since Keystone fell down on the job at the very outset, it can hardly expect a complete release by argument alone. Good faith is an element of the contract. Bodman v. Nathaniel Fisher & Co., 1920, 268 Pa. 535, 112 A. 99. And the rule is there stated, 268 Pa. at page 538, 112 A. at page 101, that:
 
 
 18
 'The burden of proving a cause for rejecting an order covered by the contract was on defendant, and, in absence of evidence tending to show a refusal under the terms of the agreement or other good cause, plaintiff was entitled to recover.'
 
 
 19
 Here, Keystone affirmatively contracted to manufacture the product involved and to furnish the necessary financing. It went beyond this, and made the literal representation that 'it is equipped to manufacture said heavy carriages, big wagons and other heavy machinery'. These contractual provisions were intended to and do have legal meaning. In the context of this case, they foreclose rejection of every order merely for lack of financial or physical capacity. The 'requirements' and 'output' cases relied on by Keystone are inapplicable; in those cases, the promissor contracted only to produce what he could or to take what he needed, and so long as he acted in good faith he did not default the contract.
 
 
 20
 Moreover, the number of orders upon which the district court allowed commissions was found by it to be within the contemplation of the parties and the contractual obligation of Keystone. The scope of the operation is adequately evinced in the record, and the district court's finding is, in our opinion, safely within that boundary. A fortiori, it was Keystone's obligation to fulfill this number of orders. We do not have before us a situation in which Keystone was pressed beyond the reasonable expectation of its agreed performance, and Keystone does not seem to go so far as to argue impossibility. But it would be legally irrelevant whether Keystone had a plant or not, for the obligation it assumed, in these circumstances, prevent the assertion of justification for non-performance. Cf. Fast, Inc., v. Shaner, 3 Cir., 1950, 183 F.2d 504; Com. ex rel. Schnader v. United States F. & G. Co., 1934, 314 Pa. 140, 146-147, 170 A. 686, 91 A.L.R. 229; Restatement, Contracts, Sections 455 and 467, and Pennsylvania Annotations thereto. We conclude that Keystone is not entitled to have the findings of the district court set aside on the grounds advanced.
 
 
 21
 Keystone's final contentions go to the questions, first, of the disallowance of the $11,500 'loan', and, second, of the computation of interest.
 
 
 22
 The district court found that Fox Co. acted merely as agent in purchasing the Drive Units previously referred to, and that title was in and remained with Keystone. We think this a particularly astute appraisal of the relationship between the parties in this connection. In any event, it clearly appears from the contract that the $11,500 provided by Keystone for the purchase of the Drive Units was an integral part of the transaction, to be recouped without interest from the proceeds of sales of carriages in which the Drive Units were incorporated, with the profits, if any, attributable to the Drive Units to be divided between the parties. The $11,500 was a part of Keystone's financial undertaking, rather than a loan to Fox Co. Indeed, it was Keystone's breach of contract which occasioned the loss, and the burden of that loss appropriately falls upon its shoulders.
 
 
 23
 Finally, we think Keystone does have a point on the matter of the interest, albeit a small one. The district court determined Fox Co.'s net loss as of June 1, 1951, with interest to the date of judgment; it then deducted the $5,000 working capital loan as increased by the specified interest from the date of Fox Co.'s note, September 24, 1948, to the date of judgment. Since the note was demandable at the time Fox Co.'s damages accrued, we think it should be treated as an offset in the nature of a payment. Accordingly, the $5,000 loan, with accrued interest from September 24, 1948, to June 1, 1951, should be credited against Fox Co.'s damages and interest applied to the resulting balance from June 1, 1951, to the date of judgment.
 
 
 24
 For the reasons stated, the judgments of the district court, as modified, will be affirmed.
 
 
 
 [1]
 Fox Co. executed a promissory note to Keystone for $16,500, which provided for 5 percent interest on $5,000 thereof. Fox Co. exercised the option for the Drive Units, and these were shipped to and received by Keystone, which took title in its own name
 
 
 [2]
 Our No. 11,622
 
 
 [3]
 Our No. 11,623
 
 
 [4]
 Treating the $11,500 for the purchase of the Drive Units as a loan to Fox Co., Keystone claimed credit against Fox Co.'s damages in that amount reduced by the $2,800 which it received from the sale of the Drive Units