**LIZZA AND SONS, INC.**

v.

**Daniel A. D'ONFRO et al.**
**and**
**Hartford Accident and Indemnity Company.**

**Civ. A. No. 58–146.**

United States District Court
D. Massachusetts.

May 29, 1959.

John L. Saltonstall, Jr., and Gael Mahony, Boston, Mass., for plaintiff.

Hugh Corcoran, Springfield, Mass., and Isadore Solomon, Leominster, Mass., for defendants.

WYZANSKI, District Judge.

1. This is an action, brought under this Court's diversity jurisdiction, for damages plaintiff alleges it sustained by failure of the first group of defendants to perform a construction subcontract and by the failure of the remaining defendant to perform the conditions of a surety bond.

2. Plaintiff Lizza and Sons, Inc., sometimes referred to as Lizza, is a New York corporation engaged in business as a general construction contractor. Daniel A. D'Onfro, Ralph D. D'Onfro, Emmanuel D. D'Onfro, Virgil D. D'Onfro, and Nicholas A. D'Onfro are citizens of Massachusetts and are co-partners doing business as Daniel D'Onfro Sons, sometimes referred to as D'Onfro. Hartford Accident and Indemnity Company, sometimes referred to as Hartford, is a Connecticut corporation, which issues contract and performance bonds.

3. The Massachusetts Turnpike Authority, sometimes hereafter referred to as MTA, is an agency of the Commonwealth of Massachusetts, which in 1955 undertook to have constructed the so-

called Massachusetts Turnpike, including the so-called Lee-Becket section. The MTA solicited bids for the contruction of that section. Lizza and others filed bids. At the opening of the general contract bids for that section, on June 1, 1955 the MTA found that Lizza was the low bidder and awarded to it the general contract for the Lee-Becket section.

4. Previously in May 1955 while preparing its bid for the MTA, Lizza had telephoned Ralph D'Onfro and Daniel D'Onfro to ask whether the partnership would be interested in acting as a subcontractor to build bridges and culverts on the Lee-Becket section if the main contract should be awarded by the MTA to Lizza.

5. May 29, 1955 D'Onfro submitted to Lizza a quotation indicating what the partnership would charge to perform such a subcontract. Although Lizza used that quotation as a guide in making its bid to MTA, Lizza did not accept that quotation or in any way enter into a contract, conditional or otherwise, with D'Onfro before MTA awarded to Lizza the main contract.

6. On the day Lizza was awarded the contract, Ralph D'Onfro sent a new quotation. There is no suggestion that Lizza accepted this quotation or that it became a contract.

7. June 10, 1955 Ralph D'Onfro and Daniel D'Onfro met with officers of Lizza at Worcester. The only significant matter was the insistence of Lizza that if D'Onfro were to do the work it should take $8,000 less than the latest quotation. Neither D'Onfro agreed to this. And there was no attempt to cover other matters.

8. July 13, 1955 the two D'Onfros went to Lizza's New York office. Al Lizza, the president of Lizza, and Cavello, its chief engineer were there. Marino, Lizza's project manager, was not present. There was a general discussion of the work to be covered by the subcontract and the price to be paid. But the parties reached no agreement. And at the end of the conference, Ralph D'Onfro

said to Cavello that Lizza should draft a contract and if the D'Onfro partnership "liked it we would execute it" (Tr. 347)

9. July 19, 1955 Lizza sent to D'Onfro a draft contract. (Ex. C) It covered with double-spaced typewriting six legal size pages. It provided compensation of $8,000 less than D'Onfro's quotation. It listed fifteen work items relating to bridges and culverts.

10. July 26, 1955 Daniel D'Onfro went to the Oyster Bay, New York office of Lizza to confer with Joseph F. Marino, the project manager of Lizza. D'Onfro had with him a letter dated July 25 addressed to Lizza and signed by Daniel D'Onfro on behalf of the partnership. This letter begins "We wish these changes made in the proposed contract you have drawn." Seven proposals are then listed.

11. D'Onfro also had with him two bonds, secured under the following circumstances. On July 25 Mrs. Daniel D'Onfro had applied to the Paul J. Woodcome Insurance Agency Inc. for a bond. That agency or Hartford had delivered to D'Onfro two Hartford bonds which it had executed in favor of Lizza, one for $300,000, the other for $320,000. Each bond recited that "the Principal (D'Onfro) had entered into a certain written contract with the Obligee (Lizza) dated the 26th day of July."

12. At the July 26 conference D'Onfro and Marino discussed the amount of the bonds, and Marino said they were excessive. But most of the conference concerned the seven proposed changes. As to these there was a general but loose understanding. And as to the first item I doubt whether there was any understanding as to how firm an obligation Lizza was undertaking with respect to the stone for riprap and slope paving. Each party recognized that there would have to be precise draftsmanship. For example, next to items 4 and 5 on the July 25 letter Marino wrote "Reword", and on the draft contract, Ex. C, Marino wrote in the margin next to article 1 "Superceded", [sic!] and next to article 4 "Rewrite". The whole tenor of the

conference, which lasted one to two hours, indicated that both parties were proceeding on the assumption that they were considering possible amendments to a draft. Marino spoke to D'Onfro of something to be "put in his contract". (Tr. 77) And at the end of the conference, as Marino himself testified, D'Onfro said he would be satisfied "if it is all put into the other contract". The objective meaning of these words was not merely that D'Onfro wanted a memorial of an oral understanding but that he intended not to be bound except by precise words spelled out in a written agreement.

13. After the July 26 conference Marino prepared a draft. He sent that draft to D'Onfro on July 27 with a covering letter (Ex. D) which reads as follows:

"As per our conversation on July 26, 1955 concerning certain revisions to be made in the contract.

"Please be advised that certain corrections have been made as per agreement.

"Please sign all three copies affix Company Seal and Attest."

14. D'Onfro rejected the draft. Lizza made no claim that there had been an over-all oral agreement and that this draft was a memorial of that agreement.

15. In the middle of August D'Onfro prepared its draft (Ex. 8). D'Onfro also procured from Hartford a new bond in favor of Lizza in the amount of $392,-000. This bond again recites that "the Principal has entered into a certain written contract with the Obligee dated the 26th day of July, 1955."

16. Lizza received about August 13 the bond and draft, but never assented to the draft.

17. September 7, 1955 D'Onfro submitted to Lizza another draft. (Ex. 14) Lizza made deletions in this draft and thereafter signed it. D'Onfro never manifested assent to these deletions.

■ 18. In drawing inferences, making ultimate findings, and stating conclusions of law as to whether the subsidiary facts just found constitute a con-

tract, it is necessary to use as a touchstone the contract law of New York. The reasons that New York contract law is applicable are that in a diversity jurisdiction action the federal court adopts the local Massachusetts state rules of choice of law and the Massachusetts state courts would turn to the place where a contract was alleged to have been made to determine whether it had indeed been made [Wetherell Bros. Co. v. United States Steel Co., 1 Cir., 200 F.2d 761, 763]. And in the case at bar the only place where plaintiff claims a contract was made in New York.

■ 19. New York has the rule common to most states that where the parties, orally or otherwise, manifest their mutual assent to all the terms of a proposed contract, then the mere fact that the parties also manifest an intention to adopt and prepare a written memorial thereof does not prevent there being a binding contract. Sanders v. Pottlitzer Bros. Fruit Co., 144 N.Y. 209, 39 N.E. 75, 29 L.R.A. 431; Disken v. Herter, 73 App.Div. 453, 77 N.Y.S. 300, affirmed without op. 175 N.Y. 480, 67 N.E. 1081. Cf. Smith v. Onyx Oil & Chemical Co., 3 Cir., 218 F.2d 104, 105, 50 A.L.R.2d 216; Banking & Trading Corp. v. Floete, 2 Cir., 257 F.2d 765, 769; Restatement, Contracts § 26; 1 Williston, Contracts, (3rd ed.) § 38; 1 Corbin, Contracts § 30.

20. The strongest statement of the New York rule comes from the Disken case where it is said at 77 N.Y.S. at page 300:

"Where all the substantial terms * * * have been agreed on, and there is nothing left for future settlement, the fact, alone, that it was the understanding that the contract should be formally drawn up and put in writing, did not leave the transaction incomplete and without binding force, in the absence of a positive agreement that it should not be binding until so reduced to writing and formally executed."

■ 21. The first portion of this quotation is unquestionably sound. But

neither the facts of the Disken case, nor the facts of any other New York case which I have seen warrant the statement that unless there is a "positive agreement" that the oral understanding shall not be binding until "reduced to writing and formally executed" the contract is complete. In New York, as elsewhere, it is quite plain that if either of the parties manifests its intent not to be bound until a written contract is executed then the parties are not bound until that event occurs. Schwartz v. Greenberg, 304 N.Y. 250, 107 N.E.2d 65; Clark v. J. & C. Auditoré, Inc., 244 N.Y. 382, 155 N.E. 679; Boysen v. Van Dorn Iron Works Co., 94 App.Div. 95, 87 N.Y.S. 995, 997; Smith v. Onyx Oil & Chemical Co., 3 Cir., 218 F.2d 104, 108, 50 A.L.R.2d 216; Banking & Trading Corp. v. Floete, 2 Cir., 257 F.2d 765, 769. As Judge Waterman said in the case last cited it is always a question of fact. But, as Judge Goodrich pointed out in the Smith case, the New York authorities tend to support the inclination of Professors Williston and Corbin "toward finding the formation of a contract prior to the signing of the document unless the parties pretty clearly show that such signing is a condition precedent to legal obligation."

22. Mindful of the strong language in the New York cases, but also mindful of the rule that an oral understanding upon all the terms of a proposed contract is not a completed contract if either party manifests his intent not to be bound (Schwartz v. Greenberg, 304 N.Y. 250, 107 N.E.2d 65) or if the surrounding circumstances show that both parties manifestly acted upon the basis that they would not be bound until a written contract has been executed (Restatement, Contracts § 26), I find as an ultimate fact that in the case at bar no contract between the parties was made on July 26, 1955 or at any other date.

23. The ultimate fact just found rests principally upon these considerations. When the parties conferred on July 13, Ralph D'Onfro asked for a written draft. July 19 Lizza sent a complicated document. When Daniel D'Onfro came to Lizza's office on July 25 the main theme of the conference was a set of possible amendments to the draft. As to those amendments there was no precise agreement. Lizza's representative, Marino, made notations indicating that a new draft would have to be made. The words Marino used, "reword" and "rewrite", manifest an intention to do something more than merely record a perfected agreement. Then, as Marino himself testified, Daniel D'Onfro used words which, objectively considered, manifest an intention not to be bound before the changes were put in writing and executed formally. Furthermore, after the July 26 conference both parties acted as though each knew the other had on July 25 manifested an intention not to be bound by any oral understanding but to be bound only by a solemnly executed writing. This seems the most likely inference to be derived from the later correspondence of the parties, the preparation of alternative drafts, and the failure of either party to suggest that there had been a complete agreement. Of course, the parties were probably ignorant of the legal rule that a complete oral agreement constitutes an immediate contract if the parties contemplated merely a memorial of that agreement, and so the mere failure of Marino to claim that the negotiations of July 25 constituted a contract would not, standing alone, be particularly significant. But what is revealing is the awareness of Marino that both he and D'Onfro had left the July 25 conference without such a precise statement of their understanding that he could reproach D'Onfro for a failure to live up to that understanding. Cf. Rosensweig v. Salkind. 5 A.D.2d 58, 169 N.Y.S.2d 213, 215.

24. No contract having been concluded on July 25, none was concluded later. Plaintiff's claim that when it returned Ex. 14 after making deletions this became a contract is an unsound claim because D'Onfro never agreed to the deletions.

25. Lizza and D'Onfro never having manifested assent to any agreement, there was no contract the performance of which Hartford could guarantee. And it is, therefore, not liable to the plaintiff on its bond.

26. There are some miscellaneous points which are worth adding. I have not neglected to consider that each of the three Hartford bonds refers to a written contract of July 26. Obviously there was no such document. And I do not regard the recital as in any way indicating the D'Onfro partnership admitted that it had reached a complete oral agreement with Lizza on that date. As to the first two bonds the recital was made before the conference of July 26. And the third bond was sent by D'Onfro with Ex. 8 which reveals that the D'Onfro partnership was still taking the position that it would not be bound to Lizza until Lizza bound itself in writing to deliver stone for riprap.

Judgment for defendants.