In the Matter of the
ESTATE OF CHARLES REDFIELD VOSE,
a/k/a C. R. VOSE, Deceased

In the Matter of the Petition of the Executors of Said Estate for a
Construction of Said Decedent's Will and Instructions as to the
Property Distributable to "CHARLES R. VOSE, INC.," and the
Persons to Whom and the Shares in Which the Stock of Said Cor-
poration Should Be Distributed, Pursuant to Article "Fourth" of
Said Will

CHARLES R. VOSE, INC., Appellant

v.

WILLIAM HOUSTON EVANS, et al.,
as Executors of Estate of C. R. VOSE, Deceased
(two cases)

CHARLES R. VOSE, INC. Appellant

v.

BLUEBEARD'S CASTLE, INC.

Nos. 14,157–14,160

United States Court of Appeals

Third Circuit

Argued February 21, 1963

Decided May 7, 1963

*See, also, 317 F.2d 281*

447

448

BERNARD G. SEGAL, ESQ. (SCHNADER, HARRISON, SEGAL & LEWIS), Philadelphia, Pennsylvania, *for appellant*

J. QUINCY HUNSICKER, ESQ. (KELLEY, DRYE, NEWHALL, MAGINNIS & WARREN), New York, New York, *for appellees*

Before McLAUGHLIN and GANEY, *Circuit Judges*, and COHEN, *District Judge*

McLAUGHLIN, *Circuit Judge*

These are four consolidated appeals[1] from the judgment of the district court raising a common question as to the interpretation of a will.

Charles R. Vose, a domiciliary of the Virgin Islands, died in a plane crash on July 10, 1957, leaving a gross estate of approximately five and one half million dollars. His estate had been accumulated over the years as a result of the diverse business enterprises which he carried on in both corporate and non-corporate form. Primary and central to all such commercial activity, however, was his operation of an insurance brokerage business as a sole proprietorship. This was started in the 1920's and continued, with increasing success, throughout his life.[2] His involvement in other business ventures did not commence until the 1940's.

---

[1] Three "actions for debt" instituted by the appellant, Charles R. Vose, Inc., and a petition for construction of testator's will instituted by testator's executors. The cases were consolidated for trial.

[2] Annual gross commissions in 1945 were $255,000 and in the four calendar years preceding his death they were in excess of $500,000. The principal source of Vose's business — comprising some 95% of the commissions — was the Atlantic and Pacific food store chain and its affiliates.

In October, 1955[3] Vose executed a will in which, after minor specific legacies, he directed his executors to incorporate his insurance business and transfer to it "all the assets of my said business," with the stock in this corporation to be distributed in varying proportions to his insurance employees of at least five years standing. The remainder, and bulk, of his estate was left to his secretary, or alternatively, the immediate members of her family.[4]

█ The sole question at issue here is what the testator intended by the phrase "all the assets of my said [insurance] business": in particular, whether certain disputed items are "assets" of the insurance business or, instead, are properly includible in the remainder of the estate. The items in dispute are (1) insurance proceeds from the destruction of an airplane, (2) sums carried on the insurance business books as "accounts receivable" from three other enterprises of the testator, and (3) bank account balances of the insurance business. As to items "1" and "2" the district court held that they were "not such assets as C. R. Vose referred to in his will which were to be transferred to C. R. Vose, Inc." and that item "3" "is such an asset minus $38,886.56."

█ We note, initially, that the dispute here is not with the legal principles applicable, but rather with the district court's findings of fact within the general legal framework. As such, the findings of the district court must prevail unless they are clearly erroneous and the record leaves

[3]His wife died in January, 1954.

[4] Testator's secretary was also appointed, with two others, as an executor and trustee of his will. Since she died in the same plane crash, under the terms of the will her two brothers (who are also residuary legatees of the estate) were substituted in her stead. Any intimation in appellant's brief that there is some impropriety in the two brothers being both executor and residuary legatees of testator's estate is clearly unwarranted. The mere existence of a possible adverse interest, without more, is not sufficient grounds for complaint in the Virgin Islands. 15 V.I.C. § 240(b) (1957). In re Below (Bishop), 3 V.I. 300 (D. 1958). More importantly, no complaint of such a nature has ever been made and thus suggested inference to the contrary has no place in this case.

us with the "definite and firm" conviction that a mistake has been made. United States v. U. S. Gypsum Co., 333 U.S. 364 (1948); Robert H. Fox Co. v. Keystone Driller Co., 232 F.2d 831, 835 (3 Cir. 1956).

## The Disputed Matters

### 1. Airplane

Item "1" involves the net insurance proceeds from the destruction of the Lockheed Lodestar in which testator died in 1957 and which, the record shows, had been purchased by testator in the latter part of 1945. The district court found that "the proceeds listed * * * as [$191,353.59, were] from the sale [sic] of Vose's * * * 'Sky Gypsy' which [was] not purchased or used mainly or to any appreciable extent from or in the conduct of his insurance business." The court evidently reasoned from this that since the testator did not buy the plane for use in his insurance business and did not use it primarily in the conduct of this business he did not intend for it to be considered as an insurance business "asset" that would devolve to the business upon his demise.

Appellant attacks this finding of fact on the grounds that (1) it is unsupported by the evidence and (2) is not decisive of the issue to be resolved. On the latter point, appellant contends that "the decisive test is the testator's understanding and intention." This conclusory language, however, is really "decisive" of nothing, for it is precisely just this question — testator's understanding and intention with respect to the word "asset" — that is at issue. Certainly such factors as the testator's reasons for purchasing the airplane and his subsequent use of it are primary indicia in resolving this question.

Appellant's argument that the district court's finding is unsupported by the evidence fares no better, for we conclude that there is sufficient evidence in the record to sup-

port its findings, and we cannot say that it is clearly erroneous.

A brief summary of testator's business and personal activities points up the significance of the factors which bear on this question.

The uncontradicted record evidence reveals that testator started his insurance business in the 1920's and was increasingly successful in its operation over the years. His central office was always in Brooklyn and branch offices were established in the late 20's and the 30's in Detroit, Chicago and Philadelphia and, in the early 40's, Pittsburgh, with a further branch office opened in Newark in 1949 (later moved to Montclair, New Jersey in 1956).

Until his marriage in 1938 substantially all of testator's business interests were restricted to his insurance brokerage and his sphere of activity was centered around its headquarters and branch offices. However, in that year his wife, shortly after their marriage, purchased real estate in Osprey, Florida, which was later transferred to testator in 1940, the same year in which he acquired real estate in Casey Key, Florida. Around 1943 he acquired more acreage and a house in Florida which became their winter home. In 1943, testator also acquired a "land operation" in upstate New York. Testator's wife bought a ranch in Melville, Montana in 1945 (this was prior to the purchase of the airplane in that year), and there is evidence that previously testator, his wife and sister-in-law had leased a cabin at a ranch in Melville. It also appears that Mrs. Vose participated quite actively in the running of this ranch. Shortly thereafter testator himself acquired cattle interests in Montana. In 1945 testator also spread his interests to the Virgin Islands, for there is testimony that in May of that year he organized two Virgin Island investment trusts for the purpose of conducting investment operations in that area.

In 1947, testator became the sole owner of the Key Nur-

sery, a wholesale and retail nursery business in Osprey, Florida and three years later he acquired an interest in a Florida plant food operation. Testator's next substantial business investment (ca. $1,500,000) came in 1953 with the organization of Antilles Enterprises, Inc., a Virgin Islands corporation, of which he subsequently became controlling shareholder. Then in 1954 he acquired another Montana interest by organizing a livestock corporation. In the same year he organized Tropical Investors, Inc. a Virgin Islands corporation which administered the bulk of a securities portfolio which he had previously conducted in his own name.

This brief résumé indicates that the diversification of testator's business and personal interests preceded, was concurrent with and followed the acquisition of his airplane in 1945. A permissible inference to be drawn from the timing of this diversification — and the one the district court drew — is that testator's expanding interests were a prime motivating factor in his purchase of the Lodestar; or cast in the negative terms of the district court, the Lodestar was not purchased primarily for use in his insurance business. Further, it is significant that there was no evidence to indicate that changed circumstances in the insurance business necessitated the purchase of an airplane in 1945. As indicated above, the headquarters and all but one of the branch offices had been well-established prior to 1945.

Other evidence to support this finding is seen in the testimony of testator's sister-in-law, Mrs. Donald. She testified that her sister (testator's wife) "thought it would be nice to have a plane of her own, because we were always getting bumped for priority reasons during the war." This idea initially started as a "joke" because there was no chance of acquiring an airplane during the war, however, "as time went on they [testator and his wife] talked more and more about it." Her testimony also reveals that the

453

difficulties of getting back and forth between Florida and Montana because of the curtailment on transportation during the war figured largely in the conversations in which they explored the possibility of purchasing an airplane. The credibility of this witness, of course, was for the district court to determine. Mrs. Donald also testified that testator was concerned about getting an airplane large enough to require a professional pilot so that Mrs. Vose — who had a private pilot's license and had crashed one plane before — would not be able to fly it. As appellees rightly point out, such a concern is more consistent with testator's treatment of the plane as one to be used for overall business and personal purposes between Florida and Montana, etc., than as a strict insurance business "asset".

As to the use of the plane, the executors showed, by a compilation of the daily whereabouts of testator and the airplane that, from 1954 until July, 1957, the Lodestar was used principally in connection with testator's activities in the Virgin Islands, Florida and Montana and not in furtherance of his insurance business. Appellant concedes that this was so. However, bottoming its argument on the position (contrary to the court's finding) that "the plane was acquired and maintained as an asset of the insurance business," it dismisses the court's finding by saying that "the simple fact is that, after 1954, the testator continued to use the plane for insurance business purposes but less frequently than in prior years." This is wide of the mark, for the very point of inquiry is whether or not the plane *should* be considered an "asset" of the insurance business within the meaning of Paragraph Fourth of the will.

Appellant's evidence as to the use of the plane indicated that testator made insurance trips to Alaska at times, but their frequency ranged, according to the witness, from only two trips since 1945 to two trips per year from 1945 to

1957. Appellant also places great emphasis on a letter sent from testator to Mr. Greenberg, his accountant, in 1948.[5] Appellant stresses that portion which states:

"By using the plane I can cover Detroit, Chicago, Pittsburgh, and New York in three days. I am entirely independent of railroad or commercial airline reservations and time tables, and I find it difficult to put into words how simple it is to be able to take off anywhere in the United States on two or three hours' notice.

"I might add that I can conceive of no one in his right mind using a plane for pleasure."

It urges that this demonstrates testator's emphasis on the utility of the Lodestar for insurance business activities. Yet, read in its entirety, the letter does not reveal this peculiar intent to limit use to his insurance business. In response to the question of "why I use a plane in my business" testator responds "Let me point out that I have offices all over the East, *and I also have considerable interests in a nursery in Florida* [Key Nursery, acquired in 1947] *and a ranch in Montana* [acquired in May, 1945]." Coupled with this evidence is a summary of his and his wife's whereabouts that testator wrote to his attorney in 1954. In that summary, he described their activities from about 1949 to 1953 as falling into "a definite pattern for years. Florida or V. I. in winter and ranch in June until after [the Christmas] holidays." His New York apartment was referred to

[5]                    "5/6/48
Dear Mr. Greenberg:
    You asked me today to give you a resume of why I use a plane in my business. Let me point out that I have offices all over the East, and I also have considerable interests in a nursery in Florida and a ranch in Montana.
    I also have very large insurance interests in Alaska, and in 1946 I took some executives of the Nakat Packing Company, my client, from Seattle to Naknek Airport on Bristol Bay, as well as to Fairbanks to a meeting and return. By using the plane I can cover Detroit, Chicago, Pittsburgh, and New York in three days. I am entirely independent of railroad or commercial airline reservations and time tables, and I find it difficult to put into words how simple it is to be able to take off anywhere in the United States on two or three hours' notice.
    I might add that I can conceive of no one in his right mind using a plane for pleasure.
                                    Yours, etc.
                                        C. R. Vose"

as "a spot to stop when in N. Y. I may be there a week or ten days every month or two."

This evidence as to his whereabouts and activities is also consistent with the testimony of Mr. Greenberg that in the latter 1940's and during the 1950's Mr. Vose devoted a great portion of his active time to the supervision of his other business interests and by that time his insurance business was able to run with his supervision and control but without the necessity of his physical presence.

However, appellant's objection to the holding of the district court goes deeper than contradictory evidence as to the use of the airplane. Basically, appellant urges that (1) the manner in which the airplane was carried on testator's books; (2) the funds from which the airplane expenses were paid and (3) the income tax treatment of the airplane depreciation are the prime and controlling determinants of the question of whether the airplane is an asset of the insurance business within the meaning of Paragraph Fourth.

The evidence as to the book entries is conflicting and is not specifically resolved by the findings of the district court. The conflict arises from the nature of the bookkeeping scheme which testator employed. Separate books were kept for each of the insurance business branch offices, the Brooklyn headquarters, and each of his other separate business enterprises, such as the Key Nursery, Montana ranch, etc. In addition, there was another separate set of books for a "New England Office" of the insurance business. This was merely a "paper office" consisting of a set of books (relating to bank accounts in Boston and Montreal), kept by testator in Brooklyn for a twofold purpose: (1) to keep separate the insurance commissions attributable to policies written outside of New York City (and thus not subject to the state gross receipts tax) and (2) for disbursements for non-insurance transactions as well as insurance business. Lastly, all of the activities of testator, insurance and otherwise, were consolidated and sum-

marized in a set of ledgers and journals referred to as "private summary books."

▇ Appellant's two-stage argument on this point is that "from the date of its acquisition, the plane was carried as an asset of that business" and since for bookkeeping purposes it is an "asset" this should control the meaning of that term as it is used in testator's will. In support of the first step in this argument appellant refers to certain balance sheets for the over-all insurance business wherein the plane is listed as an asset at its then total value. On the other hand, the executors refer to still other books in support of their contention that only a small portion of the total airplane investment was ever carried on testator's insurance books and that the balance was carried on the "private summary ledger" as a fixed asset along with such other items as testator's former Connecticut home. We do not feel that the resolution of this apparent conflict is necessary. Even assuming the validity of appellant's argument, we cannot agree with its conclusion as to the overpowering significance of such treatment. The fact that testator, for business, tax or any other reasons, might have carried the airplane as an "asset" on his insurance books is only one factor to be considered in determining the meaning of that word as it is used in his will. To say that testator carried the plane as an "asset" for bookkeeping purposes is not to say that ipso facto it must be an "asset" within the meaning of Paragraph Fourth. Appellant's position cannot be sustained for it oversimplifies the question and ignores the fact that a word may have many shades of meaning and, accordingly, must be viewed from a wider perspective.

Appellant also urges that payment of the Lodestar's maintenance and operating expenses out of insurance funds should be controlling. Again there is no specific finding by the district court as to whether or not these expenses were charged to the insurance business. It is clear that most of these expenses were paid out of the "New England Office"

account. However, as we noted earlier, this "office" account was used for both insurance and non-insurance purposes, so that proof of payments out of such an account does not indicate an unequivocal intent to give them a uniquely insurance business characterization. Further, the fact that the plane expenses might have been paid from insurance funds is not conclusive in itself, for the majority of testator's ordinary income throughout the years was derived from his brokerage business and, of necessity, many of his expenses — personal, insurance, and other businesses — were paid out of the insurance business proceeds.

Finally, appellant points to testator's income tax returns for the years 1945–1956, and terms them "decisive in themselves as to the manner in which the testator regarded the plane * * *" In each of these years, testator took depreciation on his airplane against insurance income at a value equal to its current total cost. Appellant contends that this acknowledged tax treatment for depreciation — which must be presumed to have properly qualified under the applicable Internal Revenue Code provisions — is inconsistent and irreconcilable with the finding of the district court as to the purchase and use of the airplane. It urges further that, "implicit in the holding of the court below * * * is the presumption that the testator, over a period of many years, consistently filed fraudulent tax returns." We cannot subscribe to this view.

■ Depreciation deductions under Section 23(1) (1) and (2) (as amended by § 121(c) of the 1942 Act) of the 1939 Code were allowed for "property used in a trade or business" or for "property held for the production of income." The record in these will construction suits is barren of evidence bearing on such factors as the preparation of the returns, the grounds on which testator justified his deductions, or the details of any formal agency examination or consideration of the returns. This is not an income tax case.

We are faced with the naked fact that the depreciation deductions were taken by testator and apparently not objected to by the Internal Revenue Service; nothing more. On this state of the record, we are unable to find inherent conflict between such entries and the district court's finding.[6]

■■ On balance, we cannot say that the court below was clearly erroneous in finding that the airplane was not an "asset" of the insurance business. An examination of the evidence as a whole convinces us that there was sufficient evidence to support its finding of fact.

2. "Accounts Receivable"

The district court found that as "creditor" of all his various business enterprises testator "freely withdrew funds from his insurance business which withdrawals often times would be carried on one of the various sets of insurance business books as accounts receivable; and subsequently such books would be audited and adjustment entries made to characterize the withdrawals more accurately as a withdrawal of profits or capital." Consistent with this practice the court also found that in the operation of his businesses testator "freely transferred and co-mingled the funds and assets to discharge business or personal debts as required or as his whim might dictate."

The crucial question for the district court in this instance as with the airplane, did not turn on narrow paths of inquiry as to whether testator could have a "debt" enforceable against himself or the strict accounting application of such a term as "accounts receivable". Instead, its primary focus was on whether testator treated his business

---

[6] It is also noteworthy that appellant's position, if sustained, would also make for the inclusion of the proceeds from the sale of testator's boat as an "asset" of the insurance business, for it also was consistently treated as a depreciable asset of the insurance business. However, from an adverse ruling below, appellant does not now press this item on appeal, because it did not feel that there was "sufficient evidence" introduced below to sustain its position.

affairs in a manner that would indicate that he considered certain items as "assets" of his insurance business rather than belonging to any of his other interests. Accordingly, the court found that the three accounts "were carried on the insurance business books as accounts receivable and yet had no relation to the operation of the insurance business and only represented withdrawals by Vose of funds for his other business interests." It concluded, therefore, that these items were not "assets" of the insurance business as that term was used by testator.

One of those "accounts receivable" was carried on the New England books of the insurance business for Tropical Investors, Inc., the Virgin Islands corporation which testator formed in 1954 to run a securities investment business. He owned all but the directors' qualifying shares in Tropical. The exhibits in evidence and the undisputed testimony show that from 1955 to 1957 there were frequent transfers of funds between testator's insurance and securities investment businesses. Specifically, in 1955 Tropical transferred funds totalling $99,500 to C. R. Vose which were deposited in the New England branch account. In July and August the C. R. Vose New England account in return disbursed $27,802.87 to Tropical. This left a difference of $71,697.13 in favor of the Tropical account which, pursuant to the instructions of testator, Mr. Greenberg closed out to testator's personal account by a year end adjusting entry. In 1956 this pattern of transfer was again followed, but in that year there was a $12,000 difference in favor of the C. R. Vose account, which Mr. Greenberg, at the direction of testator, closed out in testator's personal account by an adjusting entry. In January and March, 1957, Tropical disbursed $20,000 and $10,000, respectively, to C. R. Vose, New England branch and in March and June, checks totalling $135,000 were issued from the New England branch of C. R. Vose to Tropical.

The dispute is centered on the adjusting entry which Mr. Greenberg, subsequent to Testator's death in July, made in closing out this account to testator's personal account. Appellant contends that the difference of $105,000 which had been disbursed to Tropical was an enforceable debt which Tropical owed to the insurance business. Strenuous objection is made to the fact that Mr. Greenberg made a mid-year adjusting entry in closing out this sum when in practice "testator never adjusted or balanced these accounts in the middle of the year. Adjustments were made at the end of the year when all inter-enterprise transactions were concluded." The simple answer is that these same "inter-enterprise" transactions were made by testator, himself, in his various business roles and accordingly came to an end with his death. Appellant has several other objections on this score which we have fully considered. However, there is no need to itemize them, for we are satisfied that there was ample evidence to support the district court's conclusion that the $105,000 represented a withdrawal of funds by testator for use in his securities investment business.

The second "account receivable" carried on the New England books of the insurance company was for testator's Key Nursery business in Florida. The insurance company was the broker for the insurance on the nursery, which testator had started in 1947. Although the nursery consistently had an operating loss each year, the premiums due on its insurance policies were paid by it until 1953. From 1953 to 1957, however, these premiums were paid for by the insurance business and each year the balance so paid was carried forward, until on the date of testator's death they amounted to $19,204.67. This sum was subsequently written off by Mr. Greenberg as a withdrawal of insurance business capital, similar to that for Tropical Investors.

Appellant argues that this was erroneous, for it contends that the only reasonable inference to be drawn from the

461

fact that this balance was not written off each year but was carried forward, is that testator intended these sums to be regarded as advances to which the insurance business was "ultimately entitled". This argument completely ignores the testimony of Mr. Greenberg as to why no year end adjusting entries were made in this instance. He said that testator had instructed him not to write off this account on the nursery books because he wanted to impress upon his Key Nursery manager the fact that this was one of the expenses of the business which the manager should consider in his operations. Appellant points to no other evidence to support its contention and, in light of Mr. Greenberg's testimony, the evidence is more consistent with the view that testator never intended his nursery business — which at no time operated in the black — to be obligated at some future date for a continually enhanced sum.

The final "account receivable" at issue concerns sums advanced to Bluebeard's Castle, Inc., the wholly owned subsidiary of Antilles Enterprises, Inc. of which testator was controlling stockholder. In March, 1957 testator instructed the manager of his insurance business to, "if possible", send $20,000 or "what you can spare" to the account of Bluebeard's Castle, Inc. Testator also stated that "Antilles can pay as much of that back *as and when you need it.*" (Emphasis supplied). Accordingly, $20,000 was advanced to Bluebeard's and recorded as an "accounts receivable" on the insurance books. On May 20, one-half of this amount was repaid. However, since no further payments were made before testator's death, the insurance books carried the remaining $10,000 as an accounts receivable item for Bluebeard's at that time. Following the procedure that he employed for the Key Nursery and Tropical Investors accounts, Mr. Greenberg subsequently wrote off the amount as a withdrawal of capital or profit and that practice was sustained by the court below.

We believe that the district court erred in this respect. There is no evidence, as there was with Key Nursery and Tropical, of any past practice with regard to the interchanging of funds between testator's insurance business and Bluebeard's: the evidence presents this transaction as an isolated instance. More importantly, the sole evidence we have of testator's intent in this regard is contrary to an attempted inference that this was a permanent withdrawal of capital from his insurance business. He expressly stated that the sum advanced was to be paid "as and when" the manager of his insurance business needed it and consistent with this view one-half of the amount was repaid before testator's death. In light of the facts, we must conclude that the $10,000 accounts receivable from Bluebeard's Castle is an asset of the insurance business within the meaning of Paragraph Fourth.

3. Bank Account Balances

■ The final challenged item before this court is referred to by the district court as involving "Bank Account Balances — $148,279.24." The findings of fact in relation to these balances are that (1) they "represent accounts which Vose used for over-all business purposes and non-insurance purposes" and (2) "on the basis of the accounting made by Mr. Greenberg the bank account balances contained $38,886.56 which would have been withdrawn by Vose as profits in accordance with his past practice." Accordingly, it is held that these bank account balances are assets of testator's insurance business "minus $38,886.56."

The Greenberg accounting referred to by the court is "Executors Exhibit J.; Income from Insurance Offices for the Period January 1, 1957 to July 10, 1957" in which the final figure is "Net profit as yet undrawn at Testator's death — $38,886.56." This exhibit was introduced at trial as representing "a fair statement of the net profit from the insurance business" for the January-July period. We can find no express objection made by appellant at the

trial to any of the figures or computations appearing in this exhibit. On the other hand, we also find no testimony in the record to the effect that "in accordance with his past practice" testator would have withdrawn such sum.

Simply stated, the findings of fact with respect to these balances leave the issues undefined.

Although both the trial judge and appellant characterize the question as involving the entire "cash on hand and in banks" of $148,279.24, appellees inform us that they recommended at pre-trial (and the court accepted the recommendation) that this entire sum be treated as an insurance business asset, subject only to their claim for current profits. Viewed thus, the precise problem would then appear to turn on the determination of the figure for current undistributed net profits.

In any event, the present state of the record and the findings of fact leave this court unsatisfied as to the delineation of these issues and the factors which should be considered as bearing on them. The findings of fact are so inadequate on this branch of the appeal that we are not properly apprised of the basis of the district court's judgment. Cf. ICC v. Cardinale Trucking Corp., 308 F.2d 435, 437 (3 Cir. 1962). Nor can we reasonably say that the conflicting fact allegations which the parties raise on appeal as bearing on the point were fully considered by the court below.

Accordingly, the judgment of the district court will be (1) affirmed with respect to disputed item "1" and the Tropical Investors and Key Nursery Accounts of item "2"; (2) reversed as to the Bluebeard's Castle account of item "2"; and (3) remanded to the district court for more adequate findings of fact with respect to item "3".