**Glenn O. EMMONS, Plaintiff,**

v.

**Melvin A. INGEBRETSON and Minnie L. Ingebretson, Defendants.**

**Civ. No. 63-C-2012-C.**

United States District Court
N. D. Iowa, C. D.
Feb. 7, 1968.

Don W. Burington, Mason City, Iowa, for plaintiff.

Edward R. Boyle, Clear Lake, Iowa, for defendants.

## MEMORANDUM AND ORDER

HANSON, District Judge.

This action was instituted by plaintiff to recover for the breach of an alleged oral contract to convey a controlling block of 388 shares in the First State Bank of Thornton, Iowa. Jurisdiction is grounded upon diversity of citizenship. The plaintiff, Glenn O. Emmons, is a citizen of the State of Minnesota and the defendants, Melvin A. Ingebretson and Minnie L. Ingebretson, are citizens of the State of Iowa.

The Court must first briefly review the factual setting in which the negotiations between the parties took place and which purportedly culminated in a completed oral contract between them. Mr. Thomas Teas, who became an attorney and a spokesman for the First State Bank in August of 1962, testified that the Bank had been involved in what is commonly known as the "Fashion Farms" scheme with which this Court is intimately acquainted. The Bank had "problems with management." One Max

Ingebretson had performed executive services for the Bank up until August of 1962 when his resignation was obtained. The Bank had no active management when his employment was terminated.

In August of 1962 the Bank had from $530,000.00 to $540,000.00 worth of substandard loan paper and had approximately $80,000.00 of losses. In banking parlance, a substandard loan is one in which the risk is higher than usual for any number of reasons, but which may be collectible. The Bank had a total capital of $354,000.00 consisting of $75,000.00 worth of capital stock, $125,000.00 surplus, and $154,000.00 undivided profits. In Mr. Teas' estimation, the situation at that time was "alarming" as there was a possibility of extensive litigation against the Bank, with liability perhaps as great as $2,000,000.00. The Bank had a reserve of $20,000.00 for attorney fees and bond coverage with a $120,000.00 basis and a $1,000,000.00 excess provision. The primary bond covered such things as fraud and dishonesty but the Directors really "didn't know where they were."

Mr. Teas stated that the State Banking Department was "in a mood" to set aside the assets of the Bank in August but the Board of Directors of the Bank made a decision that such an action would be undesirable. The Department took the position that it would permit the Bank to continue operation upon compliance with certain conditions: that it find long-run management which would meet the approval of the Department; that the members of the Board of Directors purchase $100,000.00 worth of the substandard paper; that a Mr. Henniman from the First National Bank of Mason City, Iowa, be temporarily engaged as a consultant to the Board; and, that Mr. Teas become a member of the Board.

The Bank's condition improved somewhat during the period between August 18 and November 23, 1962. The members of the Board of Directors purchased the $100,000.00 worth of substandard paper, Mr. Henniman spent his spare

time through January 1, 1963, assisting the Bank, and Mr. Teas became a member of the Board. Also, the defendant Melvin Ingebretson purchased approximately $35,000.00 to $40,000.00 worth of the paper. He had bought about $50,000.00 worth by December 10, 1962. Mr. Teas felt that there "may have been some improvement" in the financial condition of the Bank but it was too early to be certain and the plaintiff thought that the Bank was "still in trouble" in November of 1962.

With this perspective of the financial condition of the Bank during the crucial period, the Court will explore the events which transpired in relation to the alleged consummation of a contract for the sale of the stock.

In the summer of 1962, the defendants decided that they wanted to sell their interest in the Bank. Mr. Ingebretson had been the President of the Bank and a member of the Board of Directors for over fifteen years but his age apparently prohibited him from coping with its managerial problems. The defendants owned 318 of 750 shares outstanding in the First State Bank. Mrs. Ingebretson had 160 shares of the stock registered in her name and Mr. Ingebretson owned the remaining shares. Mr. Ingebretson was actively engaged in all negotiations for both he and his wife and it is evident that he had Mrs. Ingebretson's total authority to deal with her shares. The Ingebretsons had two daughters, Maribelle Johnson and Evelyn Hiller, who had previously had control of thirty-five shares each but Evelyn Hiller's shares were registered in her husband's name at the time of the events in question.

Mr. Teas and the defendant Melvin Ingebretson were delegated the responsibility of recruiting a man capable of guiding the Bank's affairs pursuant to the demand of the State Banking Department. The possibility of plaintiff's qualification as the executive officer for the Bank was brought to Mr. Teas' attention by a mutual friend. Mr. Emmons was then employed as Cashier for the First National Bank of Emmons, Minnesota. A meeting was arranged between the plaintiff and Mr. Teas. They met in the latter part of September or the first of October at Mason City, Iowa, to discuss the matter. A considerable period of time was spent discussing the condition of the Bank, its debts, and threatened litigation against it. Mr. Teas told the plaintiff that the State Banking Department might set aside the Bank's assets and that if such action were taken, a new bank would be formed. Both were interested in the possibility of plaintiff's employment as manager of the new bank. Mr. Teas stated that plaintiff appeared to be the "right man" and so they decided to seek his endorsement by the State Banking Department. The defendant Melvin Ingebretson was not present at the meeting.

On October 8 or 10, 1962, the plaintiff and Mr. Teas traveled to Des Moines, Iowa, where they conferred with officials of the State Banking Department. Plaintiff's qualifications and the Bank's difficulties were discussed and plaintiff was told they would let him know whether or not he would be acceptable to the Department. The Department voiced its approval of plaintiff in a letter dated October 16, 1962.

Subsequent to the approval of the Banking Department, a meeting was arranged between plaintiff and the defendant Ingebretson. On October 19, the plaintiff was shown the physical plant of the Bank at Thornton. After viewing the Bank's facilities, the plaintiff, the defendant, and Mr. Teas had dinner together at the Ritz Supper Club in Clear Lake, Iowa. The financial status of the Bank was reviewed and it was agreed that plaintiff should have the opportunity to examine the books of the Bank and satisfy himself on its condition. Mr. Teas said that if there was any discussion of an agreement between the parties, it was "in a general way."

The next stage of the negotiations was reached when plaintiff returned to Thornton on October 22 to inspect the records of the Bank. The records were freely made available to him and he

spent two days examining them. Plaintiff was told of the criticized loans and all aspects of the business. Plaintiff said that it "may have been" during this two day investigation when he discovered that the Bank had $537,000.00 worth of substandard paper. It also "could have been" during this time when he found out that plaintiff did not have 388 shares and that the Ingebretson's two daughters held thirty-five shares each which Mr. Ingebretson would have to acquire. He did learn that the Board of Directors was going to "take off" $100,000.00 worth of substandard paper and that Melvin Ingebretson was going to assume an additional $50,000.00 worth.

On the afternoon of October 23, plaintiff and the defendant had a conversation as to the possibility of employing plaintiff as the Bank's executive officer. Mr. Teas was present and discerned that they had "some general arrangement as to a manner of procedure." He testified that they talked of an option. According to plaintiff, no price was fixed for the stock but that an amount of $300.00 a share was mentioned.

Sometime prior to October 25, the plaintiff presented Mr. Teas with a form or draft of option contract which he attempted to follow in drawing an agreement between the parties. The form was supplied by a lending agency in Minneapolis. Mr. Teas drafted a rough first draft of an option contract in which the defendants were to convey plaintiff an option to purchase their stock in consideration of his working for the Bank and of an employment agreement between the plaintiff and the Bank. The agreements were prepared "with a lot of blank spaces."

Previous to October 25, Mr. Teas said the conversations had been: that plaintiff would be in control of the Bank except for policies promulgated by the Board of Directors; that plaintiff's salary would be limited to $12,000.00 plus bonuses because of State Banking Department restrictions; that plaintiff's vacation time and sick leave would be thirty days; and, that the plaintiff could terminate the contract upon sixty days notice but that the Board of Directors could do so only "for cause." The conversations between the plaintiff and the defendant Ingebretson were that the defendant was willing to give plaintiff an option to purchase his stock if plaintiff would go to work for the Bank.

On October 25, a conference was held between the plaintiff, the defendant, and Mr. Teas at which the parties "started to talk about agreements." Mr. Teas testified that "we visited about purchasing the stock of Mr. Ingebretson by Mr. Emmons and under what conditions." They went over a document or documents but it is not clear whether it was the form received in Minneapolis or the first draft of the contracts or both. In one instance, Mr. Teas said they went over the form brought from Minneapolis. No accord was reached on the price to be paid for the stock. A year and one-half was set as the period in which the option was to be exercised. Mr. Teas took notes at the meeting and filled in the blank spaces on the first draft by pencil. That draft was designated as the second draft and for convenience will be so denominated herein. Plaintiff was given a copy of the first draft to take home after the meeting. Further alterations were afterward suggested on plaintiff's behalf. The changes were incorporated into a third draft which was to be the final draft with the exception of one page which was later rewritten. The "revised agreement" or the third draft was sent to plaintiff on November 3 and he received it the next day.

Mr. Teas testified as to a number of changes made from the time Mr. Teas received the form from plaintiff. Mr. Teas testified that:

"* * * From the time I received the blank form as I have testified before, which is designated A50, I took certain notes, either by telephone or in a conversation with Mr. Emmons regarding certain matters and I observed that these notes say 'The Contract of Employment, three years experience, the real estate and insur-

ance'—which I know of my own knowledge, Mr. Emmons in his employment contract would be allowed to engage in the real estate and insurance business after being employed in the First State Bank. That's the contract of employment.

With the option to purchase that would be in the nature of an installment sale. There would be deposit of stock in escrow and who would do the voting during the various times if certain things happen after they entered into this option agreement. That there would be a non-competition agreement for Mr. Ingebretson, either in banking or in the insurance business, and that there would be a provision in this document for the employment of Melvin Ingebretson and upon what terms and what position he'd hold * * *.''

The Court observes that certain major changes were noted on the second draft of the contracts which were later incorporated into the third draft. It is impossible to determine exactly when they were made but the Court will outline them so that the reader may understand the complexity of the negotiations. The alterations in and additions to the second draft of the option contract were: the buyer was to receive all cash dividends after the exercise of the option; that ten shares were to be transferred immediately to the buyer instead of five; that during the period prior to the exercise of the option, all stock was to be placed in escrow and was to be voted by the seller; that upon exercise of the option, the purchase was to take place in annual installments; that a downpayment of $33,600.00 was to be made upon the exercise of the option; and, that the seller could remain on the Board of Directors "for as long as he desires" after exercise of the option instead of being limited to two years.

The adjustments to the second draft of the employment contract were: that plaintiff's salary was considered to be exclusive of bonuses; that other than vacations, plaintiff's holidays were to be determined by a clearing house in addition to the Board of Directors; and, that plaintiff was to make "immediate plans" to move to Thornton "within a reasonable time."

The third draft of the option contract was tailored to accommodate other provisions not noted on the second draft. These changes were probably made after the meeting of October 25. They were as follows: the third draft specifically stated that the option could not be exercised by the buyer's "estate, the executors or administrators thereof, or his heirs, legatees, or devisees, or any assignee of the seller;" the annual payments after exercise of the option were reduced from $20,700.00 to $19,950.00; a provision stating that the failure to make a payment would result in forfeiture of the amount paid was deleted; and, a clause was inserted which directed that upon exercise of the option, the buyer was to become owner of the stock and that he was then to make "satisfactory arrangements" with the seller in order to insure timely payments.

The next event in the negotiations occurred when plaintiff arrived in Thornton on the afternoon of November 14. A meeting of the Board of Directors was scheduled for that evening. The plaintiff and Mr. Ingebretson met at the Bank and then went to the Ingebretson home where they conferred. Mrs. Ingebretson was present. One of the parties possessed the third draft of the contracts and it was examined at that time. A page of the option contract had to be rewritten in order to impose a 4% per annum interest rate on the unpaid balance of the purchase price of the stock.

Plaintiff testified that Mr. Ingebretson told him that one of his daughters would want $325.00 a share for her thirty-five shares. Plaintiff replied that he would think it over and let him know that night. Plaintiff concluded that he would give only $300.00 per share for all of the stock and Mr. Ingebretson "agreed to sell it" to him.

The contracts were taken to the Board meeting held that evening. On cross-examination, Mr. Ingebretson said he

used language which indicated to members of the Board of Directors that he and his wife were going to sign the contract. Mr. Teas testified that the parties had to know whether Mr. Emmons could gain the approval of the Board before the parties proceeded any further. The plaintiff related his history and qualifications for the capacity and there was a discussion about "various aspects" of the Bank. Mr. Teas was unable to recall any discussion about the option contract. Mr. Emmons believed the Board read only the employment contract. The Board then confirmed the employment of Mr. Emmons. The meeting adjourned between 11:00 and 11:30 p.m.

Mr. Teas noted that the defendants did not sign the option contract on the night of November 14 and that the employment contract was not signed by anyone. The plaintiff said that he did not sign the option contract that night and that he "probably" did not sign the employment agreement. He thought that he signed both contracts at the same time at a later date. He recalled that: "It was agreed that he should take this home—and have Mrs. Ingebretson sign it and he would sign it; and if I remember correctly, that it would be signed by the Secretary of the Board of Directors and mailed to me."

Also, under the third draft of the option contract ten shares of stock were to "immediately" be conveyed to plaintiff for the sum of $3,000.00. The shares were not transferred on the night of November 14 or thereafter.

The final sequence of events began on November 18 when plaintiff and his family drove to Thornton to "look around." At 5:00 or 5:30 p. m., they overtook an automobile in which the defendants were riding and they all went to the Ingebretson home. Mr. Ingebretson then assisted the plaintiff in a search for persons who might be interested in selling him a house. Mr. Ingebretson placed a telephone call to one person and went along with plaintiff and his family while they looked at several

houses. The drafts of the contracts were mailed that day.

Plaintiff received the contracts on the morning of November 19. The option contract had been signed by the defendants and the employment contract was signed by Duane C. Mabb, the Secretary of the Board of Directors. Mr. Ingebretson said that he called plaintiff that morning and told him to "hold up the contract." The plaintiff thought he had received a telephone call at 6:30 p. m. telling him to "hold up on the contract."

Mr. Ingebretson testified that he had talked to his daughter, Mrs. Evelyn Hiller, after Mr. Emmons had left on November 18 and that he was told that she would not sell her thirty-five shares. Mrs. Hiller similarly thought that on November 18 she and her husband had told the Ingebretsons that they would not sell their shares during a visit by the Ingebretsons to their home.

It is unclear whether plaintiff learned that one of the Ingebretsons' daughters would not sell her thirty-five shares in the telephone conversation of November 19 or during another one on November 20, but it is unimportant. Plaintiff had not signed the contracts on either date. On November 19 or 20, plaintiff contacted Mr. Teas and indicated that Mr. Ingebretson "had called off the contract." The reason given by plaintiff to Mr. Teas for the defendant's action was "something about one of the daughters would not sign or wouldn't give him the stock." Plaintiff testified that Mr. Teas exclaimed: "He can't do that! I'll talk to him." However, Mr. Teas doubted he ever made any such remark.

On November 23, the plaintiff signed the contracts and sent them back to Mr. Ingebretson along with a check for $3,000.00. This correspondence was received by Mr. Ingebretson on November 24 or 25. On November 23, the defendant Melvin Ingebretson mailed a letter to plaintiff which reads as follows:

"Dear Glenn:

Aa I told you before we signed the contract that my daughters owned 70

shares of the stock in the bank, and one of my dayghters will not sign over her shares which she has, and therefor I will not be able to go on with the contract." (sic)

The letter was received by plaintiff on November 24.

Finally, on November 26 the defendant mailed an envelope to plaintiff containing plaintiff's $3,000.00 draft and a document denominated "Notice of Withdrawal and Recission of Offer to Sell Bank Stock." Further events took place in relation to a mutual termination of any obligation plaintiff might have to the Bank but the Court does not find it necessary to go further at this time other than to mention that plaintiff subsequently retained his position as Cashier at the First National Bank in Emmons.

Preliminary to a study of the legal doctrines applicable to the instant case, the material segments of the third draft of the contracts must be set out. Those portions of the option agreement are:

THIS AGREEMENT, made and entered into this —— day of November, 1962, by and between Melvin A. Ingebretson, hereinafter referred to as the Seller, and Glenn O. Emmons, hereinafter referred to as the Buyer, .

WITNESSETH

WHEREAS, the Seller is the owner of 388 shares of capital stock of The First State Bank, of Thornton, Iowa; and

WHEREAS, the Buyer is interested in entering into an option .agreement by which he can have an option to purchase the said capital stock from the Seller under the terms and conditions set out hereinafter;

NOW, THEREFORE, IT IS AGREED:

1. That the Seller does hereby grant to the Buyer an option to purchase his 388 shares of capital stock in The First State Bank, of Thornton, Iowa, at a purchase price of $300.00 per share, and the said option may be exercised by the Buyer at any time within one and one-half years from the date hereof by the mailing of a letter indicating his intention to so do to the Seller, at the Seller's last known address, by certified mail; and it is agreed that the Seller's address, until otherwise notified, is Melvin A. Ingebretson, Thornton, Iowa.

2. That, in consideration of the granting of the said option by the Seller to the Buyer, the Buyer does hereby agree to enter into the employment of The First State Bank, of Thornton, Iowa, in accordance with the terms of the written employment contract between the said Bank and the Buyer, a copy of which is attached hereto and by this reference made a part hereof * * *.

* * * * * *

5. It is hereby agreed by the Seller that he will transfer immediately ten shares of capital stock in the said First State Bank, of Thornton, Iowa, and the said Buyer shall pay therefor the sum of $300.00 per share, these shares serving as qualifying shares for the Buyer to serve on the Board of Directors of the said Bank, and the Buyer will endorse these said shares in blank, which will also be deposited with the First National Bank of Mason City as escrow agent, who will transfer the same to the Seller in the event that for any reason this agreement shall come to a termination, and the right of the Buyer hereunder to his option to purchase the additional shares provided for herein shall terminate. Upon delivery by the said First National Bank of Mason City, the Seller shall pay the said sum of $3,000.00, which was the original purchase price, to the Buyer, his representatives, or assigns.

* * * * * *

9. Time is of the essence of this agreement.

* * * * * *

14. Minnie L. Ingebretson joins in this agreement and affixes her signature thereto for the purpose of showing that she consents to the agreement, and that she is willing and ready to execute any instruments to carry out

the same in the event it shall be necessary for her to do so.

\* \* \* \* \* \*

The employment agreement reads in part:

THIS AGREEMENT, made and entered into on this —— day of November, 1962, by and between the First State Bank of Thornton, Iowa, hereinafter referred to as the Bank, and Glenn O. Emmons, hereinafter referred to as the Officer,

WITNESSETH

`IT IS AGREED AS FOLLOWS:

1. That the Bank will employ the Officer, and the Officer will act in the capacity of Executive Vice President and Cashier for the said Bank, for the term of one and one-half years from the .date hereof, and thereafter until this agreement shall be determined by either party's giving to the other two months' notice in writing of such intended determination.

\* \* \* \* \* \*

7. It is understood and agreed between the parties hereto that the Officer shall make immediate plans and, within a reasonable time, move his home to the Town of Thornton, Iowa, and become a resident of this community.

\* \* \* \* \* \*

Turning to the questions presented in the case at bar, at the outset, the singularly most important issue confronting the Court is whether the parties entered into a binding oral contract on November 14, 1962, as alleged.

The plaintiff vigorously asserts that the terms of the agreement were mutually acceptable to the parties on November 14 and when the Board of Directors endorsed plaintiff for the position, there was a good and valid oral contract. The defendants respond that the parties intended that any agreement reached by them was to be reduced to writing and signed by them before they would be bound by it and, therefore, there was no contract because the defendant Inge-

bretson withdrew his offer before plaintiff had affixed his signature to it.

■ There are certain well-recog-nized principles of the law of contracts in Iowa which the Court deems controlling. Where the terms of a contract are not "fully and definitely settled in the preliminary negotiations, and a writing or more formal contract embodying the completed contract is contemplated, no valid and enforceable contract exists until the execution of the written or more formal instrument." Snater v. Walters, 250 Iowa 1189, 98 N.W.2d 302, 307; Brandt v. Schucha, 250 Iowa 679, 96 N.W.2d 179, 186. However, a contract does not necessarily come to fruition in all instances in which the minds of the parties have reached an accord upon the terms of a proposed agreement. As was succinctly stated in Marti v. Ludeking, 193 Iowa 500, 185 N.W. 476, 477–478:

"\* \* \* where the terms of an agreement are definitely fixed so that nothing remains except to reduce them to writing, the oral contract will . be upheld *unless it was understood by the parties that it was not to become effective until reduced to writing.* Alexandria Billiard Co. v. Miloslowsky, 167 Iowa 395, 149 N.W. 504." (Emphasis added) Cited with approval in Luse v. Waco Community School Dist. of Henry Co., Iowa, 141 N.W.2d 607.

■ These rules are consistent with hornbook law. Whether parties to an informal agreement are held to such agreement when a formal contract remains to be executed depends largely upon their intention. See 17 Am.Jur.2d Contracts, Section 28; 17 C.J.S. Contracts § 49; 1 Williston on Contracts, p. 68 (3rd ed.); Annot. 165 A.L.R. 760; Annot. 122 A.L.R. 1236. The signing of a written document can be made a condition precedent to the birth of contractual duties. See, e. g., Smith v. Onyx Oil & Chem. Co., 218 F.2d 104, 50 A.L.R.2d 216 (3rd Cir.); Clarke Bros. v. McNatt, 132 Ga. 610, 64 S.E. 795, 26 L.R.A., N.S., 585; Western Roofing Tile Co. v. Jones, 26 Okl. 209, 109 P. 225; Champion v. Hammer, 178 Or. 595, 169 P.2d 119;

Dean v. Dean, 229 S.C. 430, 93 S.E.2d 206; Summers v. Mutual Life Ins. Co., 12 Wyo. 369, 75 P. 937, 69 L.R.A. 812. Thus, even though the terms of an agreement are acceptable to the parties, a definite intention or positive agreement not to be bound until a formal instrument is executed must be effectuated.

In the case at hand, the terms of a finalized option agreement were seemingly well-settled on November 14, although a page was rewritten in order to provide a 4% per annum interest rate on the unpaid balance of the purchase price. But as will presently be seen, it is not entirely certain that the parties were irrevocably compatible on anything.

The issue narrows itself to the question of whether the parties contemplated a written document signed by each of them before any obligation of performance arose.

The plaintiff made the following answers to questions posed to him:

"Q. And there was no question that you wanted or intended to have this all reduced to writing so that you could take a copy to the borrowing agency, isn't that true?

A. I wanted it reduced to writing, yes, sir.

\* \* \* \* \* \*

Q. In other words, if you and Mr. Ingebretson did arrive at a mutual understanding for you to obtain an option to buy his stock, you wanted that in writing, didn't you, Mr. Emmons?

A. Yes, sir.

\* \* \* \* \* \*

Q. \* \* \* but all through this you intended that there be a written, signed contract?

A. Yes, sir.

Q. You did not intend to be bound by any agreement until it was signed, did you? \* \* \*

A. I intended to carry out my oral agreement of the 14th of November."

Mr. Teas supplied the following information in response to questions asked of him:

"Q. What did he say about a written agreement?

A. Well, he didn't say in so many words 'I must have a written agreement,' but I think all of us who visited—Mr. Ingebretson, Mr. Emmons and myself—were trying to reach a written agreement for the option to sell and purchase this bank stock. There was never an indication from anyone during any negotiations with them that we would have any other than some kind of a written agreement."

The defendant Melvin Ingebretson gave the following testimony:

"Q. Now, Mr. Ingebretson, will you tell this Court whether or not you intended at any time to handle this transaction of giving an option to Mr. Emmons by an oral agreement?

A. All through this deal it was my knowledge and agreed to have an agreement or option of this contract.

\* \* \* \* \* \*

A. This option should have been in writing.

Q. Did you so intend it to be?

A. That's right."

The defendant Ingebretson made these responses to interrogatories propounded to him on cross-examination:

"Q. \* \* \* Was this question asked you: 'So it was your position then, or you thought, that the agreement had been made between the bank, between you and your wife, and Mr. Emmons while he was down there at Thornton, is that true?' and your answer: 'That's right'—was that question asked and was that your answer?

A. Yes.

Q. And were you asked this question: 'And that the signing of the contract was just a formality, is that true?' and your answer: 'Well, signed a contract,'—Now, was that the question asked you, was it?

A. That's right.

 * * * * * *

Q. And your answer was as given: 'Well, signed a contract.'

A. Yes.

Q. All right. Were you asked this question: Your agreement had already been made while he was down there in Thornton on November 14th, is that correct?' and your answer: 'That's right.' Was that the question asked?

A. Correct.

Q. And was that your answer?

A. That's right.

Q. And were those answers that we have just read true to your best knowledge and belief?

A. That's right."

The Court must conclude that the parties understood from the inception of their dealings that if any agreement was reached, it would be reduced to written form and signed by them before it would be operative. As Mr. Teas perceived, the parties "were trying to reach a written agreement." The Court is compelled to adopt defendant Ingebretson's testimony as the true version of the intent of the parties. He did not intend to handle such a complex transaction by an oral or informal agreement. Neither did the plaintiff. The fact that defendant felt they had reached an agreement on November 14 is not inconsistent with the holding that there was a reciprocal understanding that they would be under no obligation until the documents were signed. A reasonable construction of defendant's testimony as a whole is that he felt they had agreed on the terms of the contract and that all that remained in order for the parties to be bound was the final execution of the documents. However, this inquiry would be deficient without an appraisal of the underlying facts.

The circumstances surrounding the negotiations between the parties buttress the conclusion that the parties' signatures were essential to the existence of a contract. The final preliminary draft required the defendants to "transfer immediately" ten shares of stock in consideration of a tender of $3,000.00 by plaintiff. The defendant did not transfer the shares on the evening of November 14 or any time prior to November 19 when plaintiff was alerted to the withdrawal of defendants' offer. The terms "immediately" and "forthwith" have been construed to be of similar import. Gates v. Knosby, 107 Iowa 239, 77 N.W. 863. The Court believes that the parties ascribed that meaning to "immediately" under this document.

The ten shares were to "serve as qualifying shares" for the plaintiff to serve on the Board of Directors. The Bank was in serious condition on November 14 and the Court does not believe that any further elaboration of its financial status is needed. The parties must have desired plaintiff's participation in the policy decisions which would guide the Bank through such a critical period as soon as was reasonably possible after an agreement was reached. The most expedient and opportune time to transfer the stock for that end would have been on the evening of November 14 if the parties has assented to a contract that night.

The plaintiff's account of the reason why the shares were not transferred is inapposite to the use of "immediately" in the third draft of the option contract and requires some elasticity in the Court's imagination. He testified that:

"I asked Mr. Ingebretson if he wanted me to pay for the ten shares of stock that night. He said it didn't make any difference and I suggested to him that possibly he would like to keep the ten shares of stock until the first of the year so he could get the dividend. He thought that would be all right."

The Court has a great disdain for questioning one's altruistic motives, but it would seem extremely improbable that plaintiff, as the key executive officer, would relinquish a means of communication with the Board and a voice in the policies controlling the Bank for a month and a half during such a delicate time for the Bank. In fact, plaintiff did not think he could go to work for the Bank without the ten shares of stock. It is difficult to conceive that plaintiff would have allowed the defendant to keep the ten shares and yet did not feel he could begin his employment without them.

Mr. Ingebretson's testimony appears to provide a more tenable explanation as to the reason the stock was not conveyed to plaintiff on November 14 or thereafter. His position was related in the following manner:

"Q. Now did you ever transfer to Mr. Emmons ten shares of stock in the bank?

A. No, I did not.

Q. Did you ever offer to?

A. Well, I didn't have a check from him or anything of that sort.

Q. Did you ever tender him ten shares?

A. No.

Q. And you never offered to transfer him ten shares, did you?

A. I would have if the contract had been finished, I would have.

Q. But I say you never did offer to transfer him ten shares, did you?

A. I would have if the contract had been finished or a payment down.

Q. But that's not my question. Did you ever offer to transfer to him ten shares of stock?

A. Well, I would have to have some money for it according to the contract.

Q. Well, my question is though, did you ever offer to transfer those ten shares of stock to him?

A. According to the contract if our contract had been made, I would have."

The Court's judgment that the contract was not intended to be completed on November 14 is borne out by the testimony of Mr. Teas as to the purpose of the Board meeting that evening. He explained that the parties met with the Board because:

" * * * when we came to a certain *stage* of the negotiations between the two principals so far as the option is concerned then we had to find out whether or not Mr. Emmons could be employed by the bank because if he couldn't the option agreement will fail. So there wasn't any reason to *go ahead* with the option until we found out if the members of the Board would hire Mr. Emmons * * *." (Emphasis added.)

The Court concurs in the view of Mr. Teas that the meeting of the Board was another stage in the orderly progression of negotiations. It was one of the final steps toward the completion of the option agreement but it was only a step and not a finalization.

The draft of the option agreement provided that "in consideration of the granting of the said option," plaintiff would enter the employ of the Bank "in accordance with the terms of the written employment contract." The employment agreement stated that plaintiff was to be employed "from the date hereof" and was to "make immediate plans" to move to Thornton "within a reasonable time." The calendar for 1962 shows that November 14 fell on a Wednesday. Plaintiff had not begun to work by Monday, November 19, the date of the revocation of the offer. Also, it does not appear that plaintiff was making "immediate plans" to move to Thornton. Such plans would necessarily include purchasing or renting a house. He did drive to Thornton to "look around" on November 18, but he apparently was doing just that. Plaintiff's inquiry as to housing appears to have been a fortuitous circumstance related to his chance meeting with the Ingebretsons and his search was not extensive.

Thus, it would seem that plaintiff had not begun performance of the employment agreement by the time he received the option and employment contracts for his signature. From his standpoint, it would have been pointless to do so before he was assured that he would have an option to purchase defendants' stock. It is abundantly clear that plaintiff's most important objective in offering his services to the Bank was to obtain a majority of its stock and his confirmation by the Board was only a "stage" toward that goal. That is why plaintiff did not initiate serious efforts to begin his duties and did not sign the employment contract that night.

■ Moreover, the circumstances present in the instant case support an inference either that the parties understood that a copy of a formalized option contract had to be furnished plaintiff's financial backers in Minneapolis or that defendant understood that such a step was necessary and manifested his view to plaintiff. As will be recalled, parties to an informal agreement may understand that there can no binding contract until it is reduced to writing and executed. See *Marti,* supra. In addition, there is a nearly universal rule that enforceable obligations cannot originate if one party does not intend to be bound prior to the execution of a written document and such intent is manifested in any way to the other party. See, e. g., Banking & Trading Corp. v. Floete, 257 F.2d 765 (2d Cir.); Smith v. Onyx Oil & Chemical Co., supra; Merritt-Chapman & Scott Corp. v. Public Utility Dist. No. 2, 237 F.Supp. 985 (D.N.Y.); Watson v. Lehigh Valley Wood Work Corp., 198 F.Supp. 273 (D.Pa.); Lizza and Sons, Inc. v. D'Onfro, 186 F.Supp. 428 (D.Mass.); Thrift Shop, Inc. v. Alaska Mutual Savings Bank, 398 P.2d 657 (Alaska); Restatement of Contracts Section 26, Comment (a) (1962); 1 Williston on Contracts, Sections 28, 28A (Rev.Ed.1936).

The plaintiff thought he had made two trips to Minneapolis and conferred with representatives of the Northwestern National Bank in order to gain the financing necessary for the stock purchase. He made the trips after his examination of the Bank on October 22 and 23. On one of the trips, he secured a form of option contract which he gave to Mr. Teas prior to the meeting of October 25. The plaintiff made the following answer to a question on this matter:

"Q. Do you recall having told Mr. Teas that you would require a written contract signed which you would have to take to these people because you were going to borrow money when you elected to purchase the stock? Did you have such a conversation with Mr. Teas?

A. *Very likely, I did.*" (Emphasis added.)

Mr. Teas was uncertain as to whether plaintiff had explicitly told him that he had to supply the lending agency in Minneapolis with a copy of a written agreement but he clearly had that impression. He said that:

"I just assumed he did. He *might not* have said it in so many words and said this was the kind of form they indicated they had used, that it would be a written agreement in substantially this form." (Emphasis added.)

It is "very likely" that plaintiff's efforts to procure financing were directly disclosed to both Mr. Teas and Mr. Ingebretson. It would be natural for them to assume that plaintiff would have to furnish a copy of the agreement to his financiers. Mr. Teas thought that the parties went over the form furnished by the Minneapolis lending institution on October 25. Between the plaintiff's examination of the Bank on October 22 and 23 and the meeting of October 25, plaintiff could have made only one of his two trips to Minneapolis. Plaintiff said that as a result of the trips, he was able to borrow the money he needed. This arrangement probably was not made during his first visit. As plaintiff's ability to proceed with the negotiations would have hinged on his success in gaining financing, it is very probable

that both Mr. Teas and the defendant were aware of the course and progress of his endeavors.

The Court should note at this point that the defendant's recollection was somewhat impaired by his advanced age and that he was not capable of remembering a number of details which would have been of value, although it was never disclosed what his precise age was. The Court must further mention that its observations of the defendant's appearance and demeanor on the witness stand convince the Court that his mental state rendered him readily susceptible to derangement and confusion on cross-examination. The Court has no doubt as to the truth of testimony given on direct examination, but in numerous instances on cross-examination, the use of leading and suggestive interrogatories were instrumental in tailoring his testimony to plaintiff's benefit.

It is possible that only Mr. Teas possessed knowledge of plaintiff's financial dealings in Minneapolis. Mr. Teas, however, was the personal attorney for Mr. and Mrs. Ingebretson at the time of the negotiations and for the Bank of which Mr. Ingebretson was President. It must be presumed that the defendant held such knowledge as Mr. Teas possessed. Farnsworth v. Hazelett, 197 Iowa 1367, 199 N.W. 410, 38 A.L.R. 814. The facts at the command of an agent are imputed to the principal whether they are beneficial or harmful to him. Restatement of Agency, Section 272 (Second ed.); cf. Farnsworth, supra; 3 Am.Jur.2d, Section 287. The knowledge which is imputed to a principal is such knowledge as is gained in the scope of an agent's employment and related to the subject matter therof. See Farnsworth, supra; Annot. 4 A.L.R.3d 224; Annot. 38 A.L.R. 820; 4 A.L.R. 1592.

It appears in the instant case that throughout the negotiations Mr. Teas was to be the scrivener of any final agreement, and as such, he was a dual agent for the parties. Generally, it is of no consequence that an agent occupies the position of dual agent and the rules applicable to knowledge gained by an agent for a single principal come into play as to knowledge possessed by a dual agent. See Annotations, supra.

Beginning with the evening of October 19, 1962, when the plaintiff, the defendant, and Mr. Teas had dinner together at the Ritz Supper Club, Mr. Teas was actively involved in the process of negotiations between the parties. On October 22 and 23 when plaintiff conducted his bank examination, he began to familiarize himself with the expectations of the parties as to the substance of a future option agreement. When plaintiff proffered the form to him which he had acquired in Minneapolis and indicated that a copy would be required for the lender's purposes, those facts became the knowledge of defendant. It was acquired within the scope of Mr. Teas' employment in drafting the agreement for them and it was very relevant thereto. If plaintiff could not have secured financial assistance, there would have been no use in continuing the negotiations, and indeed, to draft an agreement.

Therefore, it is quite apparent that the parties could have had no intention to be bound until a copy of the finished option contract was furnished to the Northwestern National Bank in Minneapolis. Obviously, if the contract was not in written form and did not have the signatures of the parties, there would be no funds with which plaintiff could purchase the stock. But apart from the intention of the parties, including Mr. Ingebretson, the plaintiff felt his conduct was controlled by the necessity of submitting the contract to the Northwestern National Bank and he undeniably manifested that fact to the defendant.

It is entirely conceivable that plaintiff was even expected to exhibit the final draft in Minneapolis prior to signing it and that such a condition was manifested "in any way" to plaintiff as explained previously. The Bank was under serious threat of having its doors closed. Even if it were reorganized with plaintiff as its executive head, the venture was some-

what speculative. It would have been good business practice for the Northwestern National Bank to reserve ultimate authority over the terms of the investment by plaintiff in order to insure the safety of their money.

Some control may have been asserted during the preliminary negotiations. On page four of the second draft of the option contract, a notation appears which proposes "How about Big Bank Committing Themselves to annual Pyts." Their influence could also have been exerted as to the period of time in which the option was to be exercised. Plaintiff desired either a two or three year time length but after bargaining the parties settled on a one and one-half year period. Plaintiff's anxiety in regard to having a sufficient length of time in which to ascertain whether the Bank would be viable could well have been shared by his financial backers.

The exact date of plaintiff's second trip to Minneapolis was never revealed. The first trip was made prior to October 25. The second trip could have been made between November 14 and 19. If so, a rational explanation might be provided for why the contracts were not signed on the evening of November 14 if the parties intended the option contract to be effective that night.

 It would seem that it would be helpful to elaborate some of the factors which many courts view as important in determning whether the parties intend to be bound prior to the formal execution of a document. In the leading case of Mississippi & Dominion Steamship Co. v. Swift, 86 Me. 248, 29 A. 1063, 1067 (1894), the Court suggested the following criteria:

" * * * whether the contract is of that class which are usually found to be in writing, whether it is of such a nature as to need a formal writing for its full expression, whether it has few or many details, whether the amount involved is large or small, whether it is a common or unusual contract, whether the negotiations themselves indicate that a written draft is contemplated as the final conclusion of the negotiations. If a written draft is proposed, suggested, or referred to during the negotiations, it is some evidence that the parties intended it to be the final closing of the contract."

See, e. g., Banking & Trading Corporation v. Floete, 257 F.2d 765 (2d Cir.) ; W. T. Grant Co. v. Jaeger, 224 Ill.App. 538; Michigan Broadcasting Co. v. Shawd, 352 Mich. 453, 90 N.W.2d 451; Dolge v. Masek, 70 Nev. 314, 268 P.2d 919; Summers v. Mutual L. Ins. Co., 12 Wyo. 369, 75 P. 937, 66 L.R.A. 812.

An additional consideration has been engrafted by a number of authorities, that is, whether all details have been fully agreed upon during the bargaining of the parties, or whether some details remain unresolved. See, e. g., Banking & Trading Corporation v. Floete, supra; Lehigh Structural Steel Co. v. Great Lakes Const. Co., 72 F.2d 229 (2d Cir.) ; Disken v. Herter, 73 App.Div. 453, 77 N.Y.S. 300 (1st Dept.) ; Sanders v. Pottlitzer Bros. Fruit Co., 144 N.Y. 209, 39 N.E. 75, 29 L.R.A. 431; Upsal Street Realty Co. v. Rubin, 326 Pa. 327, 192 A. 481; 1 Williston on Contracts, Section 63 (3rd ed.).

 An application of the standards articulated in the *Swift* case to the case at hand can lead to only one conclusion— that no contract was intended on the evening of November 14. The Court will not indulge in a lengthy discussion on this matter, but it will mention a few of the more important factors which dictate that result. The total purchase price of the stock was $116,400.00. The option and employment contracts contain numerous details and it would be an understatement to say that the option contract was of the type usually found in writing in order to attain its full expression. It was certainly a unique agreement. It consisted of two interlocking agreements between three principal parties. The remaining criteria have previously been covered. The only test which could be said to militate toward finding a completed contract is the

additional standard of whether all details are acceptable to the parties or remain unsettled, but that cannot detract from the force generated by a consideration of all the standards.

There appears to be no genuine controversy upon the sufficiency of the defendant Ingebretson's revocation or withdrawal of his offer by a telephone conversation on either November 19 or 20. Mr. Ingebretson called plaintiff on November 19 and told him "to hold up the contract" or "to hold upon the contract." It is unrealistic to believe that he offered no explanation for the demand as plaintiff testified. Mr. Teas' testimony gives support to the conclusion that he told plaintiff that he could not procure the thirty-five shares held by one daughter. In any event, plaintiff did definitely learn that Mr. Ingebretson would not be able to gain his daughter's shares on November 20 when, according to plaintiff, he called the defendant for an explanation. The plaintiff had not signed the contracts at that time.

 An offer may be withdrawn by a communication prior to acceptance which expressly or by implication notifies the offeree that the offeror does not intend to perform the contract. See, e. g., Anderson v. Steward, 149 Neb. 660, 32 N.W.2d 140, 3 A.L.R.2d 250; Hoover Motor Express Co. v. Clements Paper Co., 193 Tenn. 6, 241 S.W.2d 851; Antwine v. Reed, 199 S.W.2d 482 (Tex.Civ. App); Frank v. Metropolitan Life Ins. Co., 227 Wis. 613, 277 N.W. 643; Restatement of Contracts, Section 41. The clear implication of either or both of these communications was that the defendant would not be able to continue his offer to sell the 388 shares since he was not able to secure all the shares.

In one portion of plaintiff's brief, he contends that as the defendant Melvin Ingebretson originally sought to excuse his refusal to perform the contract on the ground that he could not obtain the thirty-five shares held by his daughter, the defendants cannot now "mend their hold" and add additional grounds. The Court does not understand this contention to be directed at the defense that no contract was ever entered. But if it is, the argument is without merit. See Mente v. De Witt Rice Mill Co., 251 F. 252 (8th Cir.); Siegel v. Waynesboro Knitting Co., 7 F.Supp. 693 (D.N.Y.); Corbin on Contracts, Section 762 (1960 ed.).

Since the Court has found that no contract was executed prior to revocation of the defendant's offer, there is no need to delve into the remaining contentions of the parties.

Accordingly, it will be ordered that the cause be dismissed.

It is ordered that the foregoing shall constitute the findings of fact, conclusions of law, and Order for Judgment in this case. Rule 52(a) of the Federal Rules of Civil Procedure.